## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Douglas Ahle, Andrew Jordan and William Wiseman, individually and on behalf of others similarly situated, | Civil File 0:09-cv-00042-ADM-RLE |
| Plaintiffs, | **DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| Veracity Research Co., | |
| Defendant. | |

## INTRODUCTION

This case is about time and money.  Plaintiffs have sued Defendant Veracity Research Co. ("VRC") claiming they worked overtime hours for which they were not paid.  Yet, discovery has disclosed that the named Plaintiffs and many of the opt ins failed to actually work the hours they claim to have worked.

In calculating their alleged overtime, Plaintiffs more than overreach.  Thus, VRC now moves for partial summary judgment on four issues relating to Plaintiffs' excessive claims.  First, all of Plaintiffs' travel time should be excluded from their overtime calculation because this travel is *explicitly excluded from working time* under the FLSA.  Second, the Court should determine, as a matter of law, that Plaintiffs are not entitled to liquidated damages because VRC acted in good faith in classifying its investigators as exempt.  Next, this Court should limit the statute of limitations to two years—denying Plaintiffs' demand for three years—because there is absolutely no evidence that VRC willfully violated the FLSA.  Finally, because Plaintiffs were paid a salary and agree

VRC compensated them for all hours worked, summary judgment should be granted as to the fluctuating workweek analysis, limiting any overtime claim to "half time."

For the reasons set forth herein, VRC respectfully requests that the Court grant its Motion for Summary Judgment.

## FACTUAL BACKGROUND[1]

VRC is a full service investigative firm specializing in insurance defense investigations. (Doc. No. 59, ¶2.) VRC offers a broad range of services from video surveillance, activity checks, background analysis, Special Investigative Unit ("SIU") fraud service, claims investigations, witness location, recorded statements, and all other aspects of private investigation. (Id.) Most of the individuals that VRC employs to perform investigative services have backgrounds in criminal justice, law enforcement, the military and the insurance industry. (Id. ¶3.)

Individuals who perform investigative services for VRC fall into one of five "levels." (Id. ¶4.) Individuals at Levels 1 through 3 are called "Surveillance Investigators." (Id.) Surveillance Investigators conduct various types of investigations, including surveillance, undercover, background, activity checks, public records searches and assets searches. (Id. ¶7.) While performing surveillance, they obtain video evidence of a subject's visible activities and formulate clear and concise reports outlining and documenting these activities. (Id.) "Claims Investigators" are at Level 4. (Id. ¶4.) Claims investigations involve interviewing witnesses, taking recorded statements, taking

---

[1]     Because VRC's motion for partial summary judgment addresses several discrete issues, it provides an overview of the relevant facts here, and detailed facts relevant to each section in its Argument.

video evidence of witnesses, objects, or property, and taking photos and data from investigation sites. (Id. ¶8.) Certain Claims Investigators also perform sales functions. (Id. ¶11.) Individuals at Level 5 hold one of two positions: "Senior Field Investigator" or "Senior Operations Investigator." (Id. ¶4.) Senior Field Investigators supervise and manage Surveillance and Claims Investigators in the field. (Id. ¶13.) They may also perform training, quality control reviews, and sales duties. (Id.) Each level requires increased responsibility and experience and carries with it an enhanced salary range. (Id. ¶6.)

VRC provides newly hired investigators with a Confidential Employee Confirmation document, which the investigators sign, confirming many of the terms of their employment. (Declaration of Marcus Doyle Ex. B.) This document describes the geographic area for which the investigator has been hired and indicates that the investigator will be responsible for traveling to any area VRC services, including possible overnight travel and travel out of state. (Hunter Dep.13-14, 23; Cruz Dep.10.)[2] The Confidential Employee Confirmation also establishes the starting salary and confirms that the investigator is a full-time exempt employee. (Doyle Decl. Ex. B.; Hunter Dep.13-14; Cruz Dep.10.)

New investigators go through approximately two weeks of training at the Company's headquarters near Dallas, Texas. (Hunter Dep.12; Ahle Dep.79.) During training, VRC explains to investigators that their investigation locations will likely vary

---

[2]     All deposition testimony cited herein are attached as exhibits A—J to Lindsay J. Zamzow's Affidavit.

from day-to-day and that it is their responsibility to travel to the surveillance location each work day.  (Hunter Dep.11; Ahle Dep.91-92; Romero Dep.195.)

In 2001 and 2004, VRC was audited by the U.S. Department of Labor ("DOL"), which concluded that VRC appropriately classified its investigators as exempt.  (Doyle Dep.21-22, 36; Foster Dep.22, 24.)   During those same years, VRC obtained legal opinions from two different law firms which found the exempt classification of its investigators to be appropriate.  (Doyle Dep.17-21; Foster Dep.30.)   In 2005, VRC consulted with attorneys from yet another law firm regarding its employment policies, including its exempt classification of its investigators.  (Foster Dep.39.)  VRC continued to consult with legal counsel regarding its employment policies and practices after 2005, and was never advised to re-classify its investigators.  (Doyle Dep.25, 29.)

On January 8, 2009, Plaintiffs Douglas Ahle, Andy Jordan, and William Wiseman commenced this lawsuit.  (Doc. No.1.)   165 Plaintiffs have opted in to the litigation, although nine have formally withdrawn.  (Affidavit of Lindsay J. Zamzow ¶3.)  Plaintiffs allege that VRC misclassified its investigators as exempt and failed to pay them overtime in violation of the FLSA.  Plaintiffs seek backpay for the allegedly unpaid overtime for a three-year period and liquidated damages.  (Doc. No. 1.)   VRC now seeks summary judgment on the issues of liquidated damages, willfulness (and therefore the appropriate statute of limitations period), the compensability of travel time, and the appropriate method of calculating overtime pay.

## ARGUMENT

**I.      SUMMARY JUDGMENT STANDARD.**

The summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are 'designed to secure the just, speedy and inexpensive determination of every action.'" Wabun-Inini v. Sessions, 900 F.2d 1234, 1238 (8th Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)).  Summary judgment shall be awarded if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322.

If the movant meets its initial burden of proving that summary judgment is appropriate by pointing to an absence of evidence to support the nonmoving party's case, the nonmovant has the task of citing particular facts in the record that exhibit there is a genuine issue for trial. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248-49 (1986). While the evidence must be viewed in the light most favorable to the nonmovant, mere speculation or conclusory allegations are insufficient.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  Plaintiffs "must do more than simply show that there is some metaphysical doubt as to the material facts."  Id. at 586.  If the nonmovant fails to set forth specific facts showing a genuine issue of fact, summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.

## II. VRC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' TRAVEL TIME CLAIMS.

In pursuit of their overtime claims against VRC, Plaintiffs seek to include as compensable working time the time they spent traveling to and from sites where they performed investigations.

Plaintiffs were paid a salary for all hours worked. They were also paid a minimum of $400 a month for vehicle allowance, a cell phone allowance, and mileage/fuel reimbursement. (Doyle Decl. ¶5.) There are two different types of travel Plaintiffs engaged in as VRC investigators. The majority of the time, Plaintiffs traveled from home to the investigation site before each work day, and from the investigation site back home at the end of each work day. (Doyle Decl. ¶3.) These trips, ranging in distance from two blocks to several hours each way, were completed in one day. (Id.) Second, when Plaintiffs were occasionally asked to drive or fly out of their home communities for investigations, VRC authorized them to stay overnight at a hotel at VRC's expense ("overnight travel.") (Id.) Whether hotel lodging at VRC's expense is appropriate is a decision made on a case by case basis by VRC managers or by the individual investigators themselves. (Doyle Decl. ¶4.) Generally, however, VRC reimburses investigators for overnight lodging on any case involving an average of three or more hours of travel time each way. (Id.) Investigators often opted, however, in their own discretion, to drive home from the investigation site even when their drive time exceeded three hours each way. (Id.)

Both types of travel—travel in one day and overnight travel—are noncompensable under the circumstances presented in this case.  Plaintiffs' travel time between home and the investigation site in one day is ordinary home-to-work commute time, which is noncompensable under the Portal-to-Portal Act.  Likewise, Plaintiffs' overnight travel is noncompensable because the travel occurred *outside* Plaintiffs' normal working hours.  Accordingly, summary judgment should be granted to VRC with regard to the Plaintiffs' travel time claims.

**A.  Plaintiffs' Travel Between Home and the Investigation Site in One Day Is Ordinary Home-to-Work Commute Time and Noncompensable.**

**i.  Ordinary home-to-work commute time is not compensable.**

An employee's commute time is noncompensable, nonworking time under the FLSA.  The Portal-to-Portal Act, 29 U.S.C. §§ 251-262, amended the FLSA to "protect employers from responsibility for commuting time."  Imada v. City of Hercules, 138 F.3d 1294, 1296 (9th Cir. 1998) (citing Reich v. New York City Transit Auth., 45 F.3d 646, 651 (2d Cir.1995)).  The Portal-to-Portal Act provides that employers *do not* have to pay wages to employees for time spent "[w]alking, riding, or traveling to and from the actual place of performance of the principal activity that such employee is expected to perform…."  29 U.S.C. § 254(a).  Travel time at the beginning and end of the work day is considered a noncompensable preliminary or postliminary activity, because it is performed *prior* or *subsequent to* the employee's principal activity.  29 C.F.R. § 790.7(c).  Courts addressing travel time claims under the FLSA have uniformly adopted the DOL's Regulation on the issue, which states:

An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel, which is a normal incident of employment. *This is true whether he works at a fixed location or at different job sites. Normal travel from home to work is not worktime.*

29 C.F.R. § 785.35 (emphasis added).

### ii.   Lengthy commutes to varying job sites are noncompensable if such travel is a *normal, contemplated* incident of employment.

The Second Circuit, in a holding subsequently adopted by at least a dozen federal courts across the country, interpreted 29 C.F.R. § 785.35 in the context of lengthy commutes to varying job sites. In <u>Kavanagh v. Grand Union Co.</u>, 192 F.3d 269 (2d Cir. 1999), the plaintiff was a refrigerator and utility mechanic, with no fixed work location. Instead, his job required him to travel daily to various Grand Union stores to perform mechanical services. <u>Id.</u> at 271. Although the plaintiff lived in Long Island, New York, there were fifty Grand Union stores he was expected to service throughout Connecticut and the state of New York. <u>Id.</u> The plaintiff would receive assignments to particular stores over the phone from Grand Union managers, and was expected to be at his assigned worksite the next day from 8:00 a.m. to 4:30 p.m. <u>Id.</u> Grand Union paid the plaintiff for mileage and gas, but not for his travel time between his home and the job site, regardless of how far he had to travel. <u>Id.</u> In an FLSA suit, the plaintiff sought overtime wages for the time he spent driving between his home and the various Grand Union stores, which averaged seven to eight hours a day. <u>Id.</u>

The court held that despite driving seven or eight hours a day, the plaintiff's travel time was *not* compensable. <u>Id.</u> at 272. Affirming the district court's dismissal of the

plaintiff's FLSA claim, the court held: "Nothing in the pertinent statutes and regulations requires Grand Union to compensate [the plaintiff] for his travel time." <u>Id.</u> The court relied on 29 C.F.R. § 785.35, which provides that employers are not required to compensate employees for "normal" travel between home and work. <u>Id.</u> The court interpreted "normal" to refer to the time:

> normally spent by a *specific* employee traveling to work. The term does not represent an objective standard of how far most workers commute or how far they may reasonably be expected to commute. Instead, it represents a *subjective standard*, defined by what is usual within the confines of a *particular* employment relationship.

<u>Id.</u> (emphasis added). The <u>Kavanagh</u> court adopted a subjective standard for determining whether travel between home and work is "normal" under the DOL Regulations. <u>Id.</u> Importantly, the court also noted that travel time is not compensable *simply because it is extensive*, stating that Grand Union was not required:

> to compensate Kavanagh for his time spent traveling to the first job of the day and from the last job of the day, regardless of the length of that distance or the benefit to Grand Union of having only one employee cover such a large geographic area.

<u>Id.</u> at 273. Since extensive travel was a "contemplated, normal occurrence under the employment contract entered into between Kavanagh and Grand Union," the plaintiff was not entitled to compensation for his travel time. <u>Id.</u> at 273 (citing <u>Vega v. Gasper</u>, 36 F.3d 417, 424–25 (5th Cir. 1994) (farm workers' travel time on bus, sometimes as long as two hours each way, is a noncompensable preliminary and postliminary activity, *i.e.*, "an extended home-to-work-and-back commute") ("The fact that the travel time was so long does not make it compensable under the [FLSA]"); <u>United Transp. Union Local 1745 v.</u>

City of Albuquerque, 178 F.3d 1109, 1120–21 (10th Cir. 1999) (holding bus drivers' travel time to and from first and last shift of the day not compensable even though it "may be more awkward or inconvenient to arrange for transportation to and from work where the employees, like the drivers here, may begin or end their work day at diverse locations."); Imada, 138 F.3d at 1297 (police officers' travel to remote sites for three-day training program not compensable, since it was "a normal, contemplated and indeed mandated incident of their employment" even though it occurred infrequently.))

Numerous federal courts have adopted the Second Circuit's holding in Kavanagh, including federal courts in Texas, California, Florida, the Tenth Circuit and Eleventh Circuit.[3]  See e.g., Smith v. Aztec Well Servicing Co., 462 F.3d 1274, fn. 3 (10th Cir. 2006) (holding that even though plaintiffs sometimes spent up to seven hours commuting each day, under Kavanagh, their travel is still "ordinary" home-to-work commuting time since it was a contemplated, normal occurrence under the employment contract); Johnson v. Rgis Inventory Specialists, 554 F.Supp.2d 693, 705 (E.D. Tex. 2007) (relying on Kavanagh in holding plaintiff not entitled to compensation for travel to various RGIS stores up to two-and-a-half hours away because "extensive travel was a contemplated, normal occurrence" of plaintiff's employment, and plaintiff "accepted the job with the understanding that she would be working in diverse store locations.").

The regulations and case law are clear. Commuting time is *not compensable*, regardless of whether the employee travels four minutes or four hours a day, and

---

[3]      Neither the district of Minnesota nor the 8th Circuit have specifically addressed the travel time issue presented in Kavanagh.

regardless of whether the employee works at a fixed location or travels to different job sites, so long as such travel is a normal, contemplated incident of employment.

### iii. Plaintiffs' travel in one day is non-compensable under Kavanagh and 29 C.F.R. § 785.35 because it was a normal, contemplated incident of employment.

In the present case, Plaintiffs' travel between home and the investigation site in one day is noncompensable under Kavanagh and 29 C.F.R. § 785.35. The facts of this case are strikingly similar to those in Kavanagh. It is undisputed that the VRC Plaintiffs also did not have a fixed worksite, but were assigned to conduct investigations at a different site each day. (Ahle Dep.91–92; Doyle Decl. ¶2.) VRC investigators obtain their assignments via email at least one day prior to commencement of an investigation, sometimes earlier. (Doyle Decl. ¶2.) As in Kavanagh, each Plaintiff accepted the investigator position at VRC with the understanding that the work site would vary day to day, depending on where the investigator was assigned. (Hunter Dep.11; Cruz Dep.12; Espitia Dep.20.)

In the present case, as in Kavanagh, extensive travel was a normal, contemplated, and mutually agreed-upon occurrence for VRC investigators. Not only were Plaintiffs aware that the location of the work site would vary, but each Plaintiff accepted employment at VRC with the understanding that the *amount* of travel would vary drastically from day to day. (Ahle Dep.293; Hunter Dep.18; Cruz Dep.16.) Every employment advertisement by VRC states that a requirement of the position is that the applicant: "Must be willing to travel, to include over state lines and over night stays." (Doyle Decl. Ex. A.) Applicants were always asked in their interviews whether they are

capable of and willing to engage in extensive travel, with overnight stays of up to 10 days at a time.  (Doyle Decl. ¶7.)  An applicant who was not willing to travel would not be considered for the position.  (Id.)  Before commencing employment, each Plaintiff signed a Confidential Employee Confirmation, agreeing to VRC's travel expectations.  (Hunter Dep.13–14; Cruz Dep.14–15; Miller Dep.29; Blais Dep.29–30; Romero Dep.135–137; Szkutnicki Dep.39–40; Alexander Dep.25–27; Soto Dep.18–22; Espitia Dep.21; Doyle Decl. ¶8.)  The Confidential Employee Confirmation identifies the area in which the investigator has been hired to service (i.e., the state of Texas) and advises investigators they "[will] be required to travel to any area that VRC services."  (Doyle Decl. Ex. B.) Each Plaintiff agreed to those terms prior to or at the inception of his/her employment with VRC.  (Hunter Dep.14; Doyle Decl. ¶8.)  The travel expectations are reinforced at the two-week training new investigators are required to attend in Dallas, Texas.  (Doyle Decl. ¶9.)  In fact, during training all investigators are required to fill out applications for investigation licenses in multiple states.  (Id.)

Ahle, for example, lived in Baxter, Minnesota, when he accepted employment with VRC.  (Ahle Dep.98.)  He understood that he would frequently be assigned to investigations in the Twin Cities, over two hours away from his home.  (Ahle Dep.98.) In addition, Ahle was regularly assigned to investigations in Chicago, Indiana, Iowa, Missouri, North Dakota and South Dakota. (Ahle Dep.108.)  Extensive travel was such a regular occasion for Ahle that throughout his employment he only performed one investigation within 50 miles of his home.  (Ahle Dep.110) ("I had one case in Merrifield, which was 15 miles away, and then the next closest one to that was in St. Cloud and

that's, you know, 60 miles away.  Those were the two closest cases I've ever had.")  In

his deposition, Ahle also testified to the following:

> Q.	You understood that that investigation site could vary from day to day?
> **A.	It always did. Sometimes it could be just across town. Sometimes it could be an hour or two or three. I only had one that was within 50 miles of my house.**
>
> Q.	But you understood that the location of the surveillance varied and that you would have to travel, correct?
> **A.	Oh, yes, most definitely.**

(Ahle Dep.91:23–25; 92: 1–7.)

Each plaintiff who has been deposed likewise testified that extensive travel was a

regular, contemplated occurrence for VRC investigators.  For example:

*Paul Romero*:

> Q.	You understood that travel was part of your job for VRC, right?
> **A.	Sure.**
>
> Q.	And what was your understanding about what would be required in terms of travel?
> **A.	There was no real defined travel….**
>
> Q.	Right, it wasn't defined. But it was broad, wasn't it?
> **A.	It was extremely broad.**
>
> Q.	Did you have a problem with it?
> **A.	Not initially, no.**

(Romero Dep.195:7–24.)

*Stacy Alexander*:

> Q.	Did you understand when you first became employed with the company that you would have to travel to other states?
> **A.	Yes.**

(Alexander Dep.12:17–20.)

13

*William Szkutnicki*:

> Q.    …You understood you had to travel from where you lived to other cities and even maybe other states to do investigations, right?
> **A.    Right.**
>
> Q.    That was made clear to you in your training in Dallas?
> **A.    Right.**
>
> Q.    Did you have a problem with that?
> **A.    No.**
>
> Q.    Everybody is told this job [involves] travel, right?
> **A.    Right.**

(Szkutnicki Dep.37).   Larry Hunter testified that although he was located in Texas, he regularly traveled to Oklahoma and Arkansas for investigations. (Hunter Dep.30.) Hunter's daily travel to an investigation site ranged from two blocks to four hours drive time, one way.  (Hunter Dep.30–31.)  Meredith Dan Miller testified that his travel from home to an investigation site ranged from 20 to 350 miles.  (Miller Dep.52–53.)  The Plaintiffs acknowledge that extensive travel was a normal, contemplated part of their employment with VRC.

> ### iv.    Plaintiffs' travel time is noncompensable because it was preliminary and postliminary to conducting investigations.

The only difference between the present case and <u>Kavanagh</u> is that Plaintiffs in the present case did not work the same hours every day.  The plaintiff in <u>Kavanagh</u>, on the other hand, was always expected to arrive at the job site by 8:00 a.m. and always finished by 4:30 p.m.  <u>Kavanagh</u>, 192 F.3d at 271.  Nevertheless, the travel time analysis under the FLSA is the same, because in both cases the travel was preliminary or postliminary to the employee's work day.

14

Although the exact start and end time varies by assignment, VRC investigators are expected to be on site in the morning, and terminate surveillance in the afternoon hours. (Doyle Decl. ¶11.)  Investigators are told at least one day before the assignment what time they are expected to be on site, and what time to terminate the investigation.  (Id.)  Thus, Plaintiffs' work days began when they arrived at the investigation site, just as Kavanagh's work day began when he arrived at the Grand Union store.  The work day ended when Plaintiffs' terminated the investigation for the day, just as Kavanagh's work day terminated when he left the Grand Union store at 4:30 p.m.  Like Kavanagh, VRC Plaintiffs' travel time from home to the investigation site, and back, is a noncompensable preliminary and postliminary activity.  Just as an employee is not compensated for driving from home to the office, VRC investigators are not entitled to compensation for driving between home and their investigation sites.

**B.**     **Plaintiffs' Overnight Travel is Likewise Non-Compensable Under the FLSA Because the Plaintiffs Traveled Outside Normal Working Hours.**

**i.**     ***"Travel away from home community"*** **under the DOL Regs.**

The DOL Regulations distinguish between travel that occurs in one day, and "travel away from home community."  The Regulations define travel away from home community as "travel that keeps an employee away from home overnight."  29 C.F.R. § 785.39.  This travel is compensable only when it "cuts across the employee's workday."  Id.  Under those circumstances, the employee is simply substituting travel for other duties.  Id.  On the other hand, travel away from home community is not worktime, and noncompensable, when it occurs *outside* regular working hours.  For example, in Imada,

138 F.3d at 1297, the court held that police officers were not entitled to compensation for their travel time when the City sent them to an overnight training activity in another city, because 29 C.F.R. § 785.39 "plainly exempt[s] from compensation an employee's travel to a location where he or she must stay overnight unless it cuts across the normal workday or the corresponding hours on nonworking days." Because the police officers were traveling out of town during nonworking hours, their time was noncompensable. Id.

ii.    **Plaintiffs' overnight travel occurred only outside normal working hours.**

Plaintiffs were occasionally asked to travel away from their home community for an investigation and in doing so, were authorized to stay overnight at a hotel at VRC's expense. Although Plaintiffs include this time in their overtime demands, such time is noncompensable under 29 C.F.R. 385.39 and Imada, because it was performed outside normal working hours.

VRC investigators' normal working hours are morning to afternoon.[4] Although the exact start and end time varies by assignment, VRC investigators are expected to be on site in the morning, and terminate their investigation in the afternoon hours, after approximately six to eight hours. For example, Alexander testified that she typically conducted surveillance from 6:00 a.m. to 2:00 p.m., or from 7:00 a.m. to 3:00 p.m.:

Q.     … The surveillance hours were 40 hours a week?
A.     **Yes.**
          …
A.     **You work X amount of hours a month, and I think it varied by the month by how many days were in the month. We were salaried. And they allotted, you know, generally, in—cases were like six to two, and**

---

[4]     VRC investigators never perform overnight surveillance.

> **then the next –like the second day on the same subject would be like seven to three or –**
>
> Q.    Okay.
> A.    **Depending on their activity.**
>
> Q.    Okay.
> A.    **But you were scheduled for eight hours.  They—you know, they contracted with the insurance companies for X amount of hours to do a case.**
>
> Q.    Got it.
> A.    **So we were scheduled to try -- you know, try to work six to eight hours on the case.**

(Alexander Dep.68;  <u>See also</u> Szkutnicki Dep.109 (working a case 7:00 a.m. to 3:00 p.m.); Romero Dep.298 (working a case 8:00 a.m. to 4:00 p.m.); Soto Dep.65 (starting surveillance at 7:00 a.m.))

Plaintiffs did not travel away from their home communities during the normal working hours—morning to afternoon—because they had to be *onsite during that time*. (Doyle Decl. ¶11.)  Plaintiffs' "overnight travel" occurred either the night prior to the investigation, or in the early morning on the day of the investigation.  Since this time falls outside Plaintiffs' normal working hours, it is not compensable.

When Plaintiffs worked outside their home communities, the travel time between the *hotel* and the work site is likewise noncompensable.  The DOL has addressed this issue squarely in a Wage and Hour Opinion Letter: "[T]he travel time from the hotel to the work site and back would be considered ordinary home-to-work travel, and, as such, need not be compensated."  (May 13, 1996).  The hotel is essentially a substitution for the home, and the travel time is considered ordinary, noncompensable home-to-work travel.

### iii.     Travel Away From Home by Airplane Is Also Not Compensable.

On rare occasion, Plaintiffs flew out of town for an investigation.  (Doyle Decl. ¶12.)  Ahle testified that he flew out of state for investigations on only three or four occasions during his 12 months of employment.  (Ahle Dep.100.)  Hunter testified he flew out of state on two occasions in 18 months of employment.  (Hunter Dep.24.) Throughout Cruz's three year employment with VRC, he flew out of town on two occasions for an assignment.  (Cruz Dep.13.)  Romero never flew out of town for a single VRC investigation.  (Romero Dep.197.)

29 C.F.R. § 785.39 treats airplane travel identical to vehicle travel when traveling away from one's home community: travel time is not compensable if performed during nonworking hours.  On the rare occasions Plaintiffs flew out of town for an investigation, they did so outside working hours.  (Doyle Decl. ¶12.)  This travel time is not compensable.

Since Plaintiffs are not entitled to compensation, including overtime wages, for any of their travel time, this Court should grant summary judgment in favor of VRC on Plaintiffs' travel time claims.

### III.   VRC IS ENTITLED TO SUMMARY JUDGMENT AS TO LIQUIDATED DAMAGES BECAUSE VRC ACTED REASONABLY AND IN GOOD FAITH.

### A.   The FLSA Liquidated Damages Standard.

While liquidated damages may be imposed on employers who violate the FLSA, the FLSA carves out a safe harbor exception for employers who act in good faith with "reasonable grounds for believing" that they have complied with the FLSA.  Portal-to-

Portal Act § 11, 29 U.S.C. § 260 (2006); see also Marshall v. Brunner, 668 F.2d 748, 753 (C.A. Pa. 1982) (noting that by enacting § 11 of the Portal-to-Portal Act, Congress intended to provide a defense to the liquidated damages provision of the FLSA). "The 'good faith' requirement is a subjective standard where the employer must only establish 'an honest intention to ascertain and follow the dictates of the FLSA.'" Chao v. Barbeque Ventures, LLC, 547 F.3d 938, 942 (8th Cir. 2008) (citing Hultgren v. County of Lancaster, Neb., 913 F.2d 498, 509 (8th Cir. 1990). The employer does not have to show it was *correct* in its analysis of the FLSA, but only that its position "was objectively reasonable." Hultgren, 913 F.2d at 509. The FLSA safe harbor specifically grants the Court discretion to determine the issue of liquidated damages. 29 C.F.R. § 790.22 (2006) ("Discretion of court as to assessment of liquidated damages"); see also Cross v. Ark. Forestry Comm'n, 938 F.2d 912, 917 (8th Cir. 1991) ("The trial court has discretion not to award liquidated damages if the employer demonstrates that the violation was in good faith and objectively reasonable.").

Applying the standard above to the facts of this case requires a finding that liquidated damages are inappropriate as a matter of law. VRC is entitled to summary judgment on the liquidated damages claim because no reasonable jury could conclude that VRC acted unreasonably or in bad faith in its efforts to comply with the FLSA.

**B.     VRC Acted Reasonably Based Upon the Advice of Counsel.**

To show that it acted reasonably—even if an FLSA violation is ultimately determined—an employer must show that its conduct was "objectively reasonable." See Marshall, 668 F.2d at 753. "To satisfy [this] objective standard, [an] employer must act

as [a] reasonably prudent man would have acted under [the] same circumstances."
Brooks v. Village of Ridgefield Park, 185 F.3d 130, 137 (3d. Cir. 1999) (citation
omitted).  An "employer may not rely on ignorance alone in meeting the objective test."
Id. at 753.  However, the mere fact that an employer's conduct violates the FLSA does
not demonstrate that the employer acted unreasonably.  See Cross, 938 F.2d at 918 (citing
Clymore v. Far-Mar-Co., 709 F.2d 499, 505 (8th Cir. 1983)).

Courts have routinely found that employers act reasonably when they rely on the
advice of attorneys in attempting to comply with the FLSA.  See Hultgren v. County of
Lancaster, Neb., 913 F.2d 498, 509 (8th Cir. 1990) (affirming magistrate's determination
that employer acted reasonably in relying on attorney's advice regarding compensation
under the FLSA); Brooks v. Village of Ridgefield Park, 185 F.3d at 137; Hill v. J.C.
Penney Co., 688 F.2d 370, 375 (5th Cir.1982); VanDyke v. Bluefield Gas Co., 210 F.2d
620, 622 (4th Cir. 1954).  Indeed, the Sixth Circuit has even held that where an employer
has counsel, liquidated damages are inappropriate if the attorney fails to inform the
employer that his conduct violates the Act.  See Featsent v. City of Youngstown, 70 F.3d
900, 906-07 (6th Cir. 1995) ("During negotiations, the [employer] was represented by an
attorney. Presumably, the duty of the attorney was [in part] to ascertain and follow the
dictates of the law, including the FLSA. There is no evidence that at any time the . . .
attorney advised the [employer] that the Agreement's method of calculating overtime
compensation violated the [Act].").

Far from ignoring the mandates of the FLSA, VRC has vigilantly attempted to comply with its provisions and has regularly sought and relied upon the advice of counsel in pursuit of that goal:

- In 2001, VRC asked a Texas law firm (the Ashcraft law firm) to provided legal advice to VRC on employment issues, including the issue of whether VRC's investigators needed to be paid overtime. (Doyle Dep.18.)  The Ashcraft law firm advised VRC that its investigators did not need to be paid overtime.

- In 2001, VRC also hired an attorney from a different law firm for a second legal opinion on employee classification issues. (Doyle Dep.19-20; Foster Dep.30.) This attorney also concluded that VRC's investigators were properly classified as exempt. (Doyle Dep.21).

- In 2004, VRC again asked the Ashcraft law firm to revisit the issue of the exempt classification of its investigators.  Again, the Ashcraft law firm issued an opinion letter advising VRC that its investigators did not need to be paid overtime.

- In 2004, VRC also consulted another attorney for advice on the classification of its investigators. (Doyle Dep.19–20, 24–25.)   This attorney also confirmed prior advice that the investigators were properly classified as exempt.

- In 2005, VRC engaged a law firm in California to examine and provide advice on its employment policies for compliance with California laws. (Foster Dep.38-39.) This law firm also made no recommendations to alter the exempt classification of VRC's investigators.

- From 2006 to the filing of this lawsuit, VRC continued to consult with its employment attorneys on "every aspect" of its employment practices. (Doyle Dep.25.) These attorneys never advised or recommended that VRC re-classify its investigators as "non-exempt." (Doyle Dep.28.) In reliance on this advice, VRC continued to classify its investigators as exempt. (Doyle 29.)

- In 2008, an attorney from the Fellers, Snider, Blankenship, Bailey & Tippens law firm in Oklahoma City reviewed and revised VRC's Employee Handbook and appendices. (Foster Decl. Ex. F.) This law firm also did not recommend that VRC reclassify its investigators as nonexempt.

As the facts overwhelmingly demonstrate, VRC has gone well beyond mere reasonable conduct to ensure its compliance with applicable wage and hour laws—both

21

state and federal.   Indeed, VRC based its classification of its investigators on several

exemptions to the FLSA, all of which were specifically advised by VRC's legal counsel.

(Doyle Dep.21; Foster Decl. Ex. A.)   One of those exemptions was the motor carrier

exemption under §13(b)(1) of the FLSA.[5]   VRC also relied on the exemptions listed in §

13(a)(1) of the FLSA.   (Doyle Dep.21; Foster Decl. Ex. A.)

In a case with similar "compliance" facts, this Court acknowledged that the

employer's conduct not only defeated willfulness/bad faith, but almost led the Court to

grant summary judgment for the employer.   See Nerland v. Caribou Coffee Co., 2007

---

[5]      The motor carrier exemption excludes from the FLSA's overtime requirements
employees who are subject to the jurisdiction of the Secretary of Transportation. 29
U.S.C. §13(b)(1). The Secretary of Transportation has jurisdiction to regulate the
maximum hours of service for employees of motor carriers and motor private carriers.
49 U.S.C. § 13501; Villegas v. Dependable Constr. Services Inc., 2008 WL 5137321
(S.D. Tex. 2008).   VRC investigators fell under this exemption.   On August 10, 2005,
Congress enacted the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A
Legacy for Users ("SAFETEA-LU").   SAFETEA-LU amended the Motor Carrier Act to
cover only *commercial* motor vehicles, which generally means vehicles that weigh more
than 10,000 pounds. SAFETEA-LU did *not* directly amend the FLSA; however, in 2007,
courts held that SAFETEA-LU modified the motor carrier exemption to the FLSA,
converting many previously-exempt employees into non-exempt employees.   See
Kautsch v. Premier Communications, 2008 WL 539324 at *1 (W.D. Mo. 2008).

With technical, complicated and flip-flop changes, SAFETEA-LU caused
considerable confusion for employers and tremendous difficulty for compliance.
Accordingly, the Technical Corrections Act (TCA) was enacted in 2008 to repeal
SAFETEA-LU.   *It was not until 2009* that federal courts definitively determined that the
TCA's repeal of SAFETEA-LU was *not* retroactive.   Accordingly, SAFETEA-LU's
definition of "motor carrier" still applied to the 2006-2008 time frame.   See Tews v.
Renzenberger, Inc., 592 F. Supp. 2d 1331 (D. Kan. 2009).   This action was filed against
VRC in January 2009, amidst the confusion over the Motor Carrier Act, SAFETEA-LU
and TCA.   And, despite the fact that VRC regularly consulted with legal counsel on
employment matters, VRC was never informed that the motor carrier exemption to the
FLSA had been modified and no longer applied to its employees.   This lawsuit was
VRC's very first clue.

WL 1170770 *3 (D. Minn. 2007) ("Caribou . . . reviewed the classification of its store managers with legal counsel several times since 2000" and "each time, counsel opined that [Caribou's] classification [of its SMs as exempt employees] was generally consistent with the FLSA.")  On these facts, the Court opined:

> The undisputed evidence on which Caribou relies came close to persuading this Court to grant summary judgment to Caribou on the FLSA claims. When evidence tempts a judge to grant summary judgment to the employer on the question of whether the employer violated the FLSA at all, that evidence is obviously not sufficient to permit a reasonable jury to conclude that the employer violated the FLSA knowingly or acted with reckless disregard of the FLSA.

Id. at *4.

VRC's similar reliance on the advice of counsel in treating its investigators as exempt under the FLSA more than satisfies the reasonableness standard of 29 U.S.C. § 260.  No reasonable trier of fact could conclude otherwise.

### C.   VRC Acted in Good Faith Based Upon the Advice of Counsel _and_ Multiple Successful DOL Audits.

To demonstrate good faith under 29 U.S.C. § 260, "the employer bears the burden of proving an honest intention to ascertain and follow the dictates of the FLSA." Hultgren, 913 F.2d at 509; see also 29 U.S.C. § 260.  To make this showing, an employer need only demonstrate that it "subjectively acted with honest intention to ascertain what [the] FLSA require[s] and to act in accordance with it."  Kinney v. District of Columbia, 994 F.2d 6, 12 (C.A.D.C. 1993); see also Marshall v. Brunner, 668 F.2d at 753 ("The good faith requirement of the Portal-to-Portal defense requires that the employer have an honest intention to ascertain and follow the dictates of the law.").  As the Eighth Circuit has said, an ultimate finding that "[an employer's] decisions were incorrect does not

detract from the [employer's] good faith attempt to comply with the FLSA." <u>Cross v. Ark. Forestry Comm'n</u>, 938 F.2d at 917.

VRC's conduct bears no resemblance to the types of conduct that demonstrate a lack of good faith under the FLSA.  In <u>Burgess v. Catawba County</u>**,** the court found that the employer did not exhibit good faith where it failed to investigate the Act's requirements and failed to remedy its violations of the statute for more than a year and a half *after it became aware* of those violations.  805 F. Supp. 341, 350-51 (W.D.N.C. 1992).  Similarly, in <u>Marshall v. Brunner</u>, the Third Circuit found a lack of good faith where the employer continued to violate the Act after it was informed of its non-compliance and threatened employees who failed to assist in hiding the FLSA violations with termination.  668 F.2d at 754-55.

While the employer has the burden of proving good faith under 29 U.S.C. § 260, courts will rely on employers' efforts at FLSA compliance as evidence of their subjective good faith.  In <u>Hultgren</u>, the Eighth Circuit found that the employer had acted in good faith and refused to award the plaintiff liquidated damages.  913 F.2d at 509.  According to the court, it "had no reason to doubt [employer's] 'honest intention' to comply with the [FLSA]" where the employer and its "officials testified they obtained . . . opinion letters and consulted with counsel numerous times in attempting to comply with FLSA requirements."  <u>Id.</u>  As in <u>Hultgren</u>, there can be no doubt that VRC acted in good faith given its efforts to obtain legal advice as to wage and hour compliance.  The facts in this case evidence VRC's repeated attention to the FLSA, state wage and hour laws, and to its classification of investigators specifically.  In addition to the advice of counsel, courts

have found that an employer's reliance on a DOL determination is enough—on its own—to establish an employer's good faith for purposes of eliminating liquidated damages. In Miller v. Kansas Power & Light Co., a case arising under the Equal Pay Act (to which the FLSA's liquidated damages provision also applies), the DOL investigated the employer a few years prior to the lawsuit and found no equal pay violations. 585 F.Supp. 1509, 1515 (D. Kan. 1984). Since the employer, in good faith, relied upon this determination, the court declined to award liquidated damagers. Id.

Similarly, in Kautsch v. Premier Communications, 2008 WL 539324 (W.D. Mo. Feb. 26, 2008), the court denied the plaintiff's summary judgment motion on liquidated damages under the FLSA because the employer relied on a Compliance Action Report issued to it during an investigation by the DOL, which found no violations for overtime or minimum wage compliance. The court stated: "A letter received as a result of a DOL investigation may sustain a defense of good faith reliance against a claim for liquidated damages." 2008 WL 539324 at *4 (citing Viciedo v. New Horizons Learning Center of Columbus, 246 F. Supp. 2d 886, 906 (S.D. Ohio 2003)); cf. Reedy v. Rock-Tenn Company of Arkansas, 2009 WL 1855544, *9 (E.D. Ark. June 29, 2009) (finding an employer did not act willfully in misclassifying an employee because the employer relied on a Department of Labor investigation from three years prior, which concluded that the employer "was not improperly applying FLSA's exempt status to any of its salaried employees.")

VRC relied on no less than three separate government audits or investigations—all providing VRC with a clean bill of health—when it continued to classify its investigators as exempt:

- VRC was audited by the U.S. Department of Labor ("DOL") in 2001. The DOL conducted a thorough investigation, scrutinizing how the company classified investigators, administrative staff, outside sales people, managers, etc. (Doyle Depo. 21).   After a "thorough investigation of every department," the DOL concluded that *VRC had not violated the FLSA in any respect,* including classifying their investigators as exempt.  (Doyle Depo 21; 22; 36).

- In 2004, VRC was again audited by the DOL.  (Foster, 22.)  The DOL again found that VRC was "doing everything correctly . . . everything was done exactly as it should be."   The DOL found no impropriety with VRC's classification of its investigators as exempt.  (Doyle Dep.36; Foster Dep.24.)

- In 2006, a wage and hour complaint was lodged against VRC by an employee with the Texas Workforce Commission.  The Commission issued a Preliminary Wage Determination Order dismissing the complaint, finding that the evidence was "not sufficient to support a finding that a sum of money is due to the claimant for unpaid overtime." (Foster Dep. Ex. E.)

These facts not only provide a *reasonable basis* for VRC's continuing decision to classify its investigators as exempt, but also establish that VRC affirmatively acted *in good faith*.  Far from knowing that the FLSA prohibited its classification decision, VRC was confident its classification decision was correct based upon multiple law firms and three government agencies confirming it.  Indeed, VRC's CEO stated in his deposition:

> We were relying on our attorneys and the fact that we went through both audits from the DOL. We relied on the fact that we had hired professional lawyers to give us guidance as we went through this. We relied on the fact that we were doing the things right and had already been found to be doing it right.

(Doyle Dep. 34.)

The evidence conclusively establishes that VRC, relying on the results of two DOL audits, the conclusion of the Texas Workforce Commission, and the advice of a number of law firms, acted in good faith and had reasonable grounds to believe it was complying with the FLSA.  Accordingly, VRC respectfully requests that the Court grant summary judgment in its favor on the issue of liquidated damages.

## IV.   VRC IS ENTITLED TO SUMMARY JUDGMENT THAT IT DID NOT WILLFULLY VIOLATE THE FLSA AND THEREFORE A TWO-YEAR STATUTE OF LIMITATIONS APPLIES.

Under the applicable statute of limitations, claims brought for violations of the FLSA must be "commenced[6] within two years after the cause of action accrued."  29 U.S.C. § 255 (2006); McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988).  A party may extend the statute of limitations to three years only if the employer's violation is willful.  29 U.S.C. § 255.  The Supreme Court has defined a "willful" violation of the FLSA as one where the employer acts with "knowing or reckless disregard for the matter of whether its conduct was prohibited by statute."  Richland Shoe Co., 486 U.S. at 133.  In Richland Shoe, the Supreme Court rejected an alternative, less stringent standard of willfulness that "merely require[d] that an employer knew that the FLSA was in the picture[.]"  486 U.S. at 132.  The Court found that Congress "intended to draw a significant distinction between ordinary violations and willful violations."  Id. at 132.  The Court found that Congress "intended to draw a significant distinction between

---

[6]   An action is commenced under the FLSA when a party files suit.  29 U.S.C. § 256(a).  In the case of a collective action under the FLSA, the action is commenced as to each plaintiff when he or she files a written consent to become part of the action.  Id. § 256(b).

ordinary violations and willful violations." Id. In short, the Court concluded an employer's general knowledge regarding a statute's potential applicability does not prove willfulness.[7] Id. Thus, where an employer acts reasonably, or acts unreasonably but not recklessly, its action is not willful. Id. at 135, n.13; see also Smith v. Heartland, 418 F. Supp. 2d 1129, 1141 (D. Minn. 2006) (granting summary judgment to employer on willfulness issue, limiting recovery to two-year period immediately preceding filing).

Unlike the liquidated damages analysis, *Plaintiffs* bear the burden of establishing a willful violation. Adams v. United States, 350 F.3d 1216, 1229 (Fed. Cir. 2003). Courts have held that the showing required for willfulness is demanding, and proof of willfulness must be strong, such as "evidence of a scheme by the employer to cover-up FLSA violations." Williams v. Maryland Office Relocators, 485 F. Supp. 2d 616, 621 (D. Md. 2007); see also Duncan v. Brockway Standard, Inc., 1992 WL 510256 (N.D. Ga. 1992); Martin v. Deiriggi, 985 F.2d 129, 136 (4th Cir. 1992) (holding that an employer destroyed and withheld records in order to block a DOL investigation of FLSA violations supported a finding of willfulness). Plaintiffs cannot meet their burden. There is simply no evidence VRC knew the FLSA prohibited its classification decision, much less that VRC acted in reckless disregard of the FLSA. The exact opposite is true.

---

[7]    The Supreme Court also rejected a different alternative standard for willfulness that would have made "the issue in most cases turn on whether the employer sought legal advice concerning its pay practices." Richland Shoe Co., 486 U.S. at 134. Here, VRC repeatedly sought legal advice. See Section III(A-C), supra. As such, even under this alternative standard, Plaintiffs could not prove willfulness.

**A.    VRC's Initial Decision to Classify Investigators as Exempt Was Based on Industry Standard.**

At the outset, VRC followed the industry standard in classifying investigators as exempt.  When VRC was formed in 1995, the owners—Mr. Doyle and Mr. Foster—made the decision to classify its investigators as exempt because it was the standard "not only for private investigators, but also for the investigation industry as a whole, special investigation units, . . . and so forth." (Doyle Dep.15.)  In fact, prior to establishing VRC, Doyle and Foster both worked for an investigation company that classified its investigators as exempt. (Doyle Dep.15.)  Every investigation company Doyle and Foster were aware of classified its investigators as exempt. (Doyle Dep.15.)

**B.    VRC Took Affirmative Steps to Ensure Compliance with the FLSA.**

Following VRC's initial exempt classification, VRC regularly sought the advice of counsel to ensure its practices complied with the law.  As discussed in Section III(A-C), _supra_, VRC took affirmative and intentional steps to comply with the FLSA.  This is _far more_ than an employer must do to defeat a showing of "willfulness."   VRC's classification decision was sustained by the DOL twice, a state agency once, and by several law firms on a number of occasions.  None of the agencies and none of VRC's legal counsel gave VRC any indication that its exempt classification decision was anything less than appropriate.

**C.    VRC Was Not Aware that Plaintiffs Disagreed With Their Classification.**

Further, VRC was not aware that the Plaintiffs disagreed with their classification. As Ahle testified in his deposition:

> Q.   At no point in time did you come to VRC and complain about the fact that you were a salaried—being treated as a salaried-exempt employee, correct?
> **A.   That's correct.**

(Ahle Dep. 74.)   Plaintiff Romero testified that although he filed a complaint with the

Texas Department of Labor, he, also, did not complain directly to VRC:

> Q.   And did you tell VRC you had contacted the Texas Department of Labor?
> **A.   No.**
>
> Q.   How come?
> **A.   At the time it didn't seem prudent or didn't seem like they needed to know….**

(Romero Dep. 115.)   Likewise, Szkutnicki testified that he never complained about his

exempt status:

> Q.   Have you ever complained to anybody at VRC about what you're seeking in this lawsuit? You said lost wages or funds. Have you ever complained to anybody at VRC about that?
> **A.   No.**
>
> Q.   Why not?
> **A.   I just figured it's not going to go anywhere.**
>
> Q.   How come?
> **A.   I don't know. I never brought it to anyone's attention….**

(Szkutnicki Dep. 12-13.)   The Plaintiffs' failure to bring their complaints to VRC's

attention is further evidence negating any inference of willfulness.

Since it is *Plaintiffs'* burden to *affirmatively* prove that VRC violated the FLSA

willfully, it is reasonable to consider Plaintiffs' perspective on whether there was a

violation, including whether Plaintiffs ever complained to VRC about their exempt

classification.   The absence of complaints also confirms VRC's continued understanding

that their classification decision was appropriate.

VRC has presented an abundance of evidence demonstrating it took affirmative steps to ensure compliance with the FLSA.  There is absolutely no evidence that if VRC violated the FLSA, it did so willfully or recklessly.   Accordingly, VRC respectfully requests that the Court grant summary judgment in its favor on the issue of willfulness under the FLSA and hold that the two-year statute of limitations period in 29 U.S.C. § 255 applies.

## V.   THE FLUCTUATING WORKWEEK METHOD IS THE APPROPRIATE METHOD OF CALCULATING DAMAGES IF PLAINTIFFS LATER ESTABLISH LIABILITY FOR UNPAID OVERTIME.

In the unlikely event Plaintiffs establish that they are entitled to overtime compensation, their measure of damages will be squarely at issue.  Plaintiffs' only legitimate measure of damages would be half-time, based upon the "fluctuating workweek" method of analysis.  The fluctuating workweek method of calculating the regular rate of pay applies where, as here, the employee is paid a fixed weekly salary regardless of the number of hours to be worked.  29 C.F.R. § 778.114.  The regular rate for purposes of calculating overtime is determined by dividing the salary by the number of hours actually worked in a particular workweek.  See, e.g., Blackmon v. Brookshire Grocery Co., 835 F.2d 1135, 1138-39 (5th Cir. 1988).  The regular rate will, therefore, change every week.  29 C.F.R. § 778.114; Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 580 (1942).

The practical, but very important, effect of the fluctuating workweek methodology is that an employee's salary is deemed to constitute straight time pay for each hour of work, no matter how few or many, and including overtime hours.  When an employee has

been paid straight time for *all* hours, including those in excess of 40, the requirement of "time and a half" is met by paying additional half-time on top of the salary:

> Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

29 C.F.R. § 778.114.  Any other result constitutes a windfall to the employee, who would receive straight time for hours over 40, as well as straight time again, plus half-time, for those same hours over 40.  Here, the fluctuating workweek method applies to Plaintiffs' overtime claims because they received a fixed salary for all hours worked.

### A.    The Fluctuating Workweek Method Applies In This Case Because The Parties Intended Plaintiffs' Salaries To Compensate Them For All Hours Worked.

In order to apply the fluctuating workweek method, the following prerequisites must be met: (1) fluctuating hours; (2) fixed weekly salary regardless of hours worked; (3) salary sufficient to provide minimum wage; (4) "clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek"; and (5) "extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay."  29 C.F.R. § 778.114(a).  The first three factors are indisputably met.  While Plaintiffs might contend that the fourth and fifth factors—"clear understanding" and "extra compensation"—cannot be met in a misclassification case, this suggestion is not supported by DOL regulations or the overwhelming majority of case law.

> **i.      Plaintiffs understood that they were paid a fixed salary for all hours worked.**

VRC's investigators were paid a salary.  This is undisputed.  VRC's investigators worked various hours per week.  This is undisputed.  And VRC's investigators received the same salary no matter what hours they work.  This is also undisputed.

Plaintiffs testified that their hours fluctuated, that they understood they were paid on a salary basis, and that the salary they received was intended to compensate them for all hours worked:

*Douglas Ahle:*

>  Q:     You understood that you would be paid a salary for all of the work that you were asked to do?
>  **A:     That is correct.**  (Ahle Dep.78.)

>  Q.     The next paragraph says, this full-time exempt salary position does not have regular hours and/or days on or off work and each employee's schedule may be changed at any time with any given pay period.  Was that your experience?
>  **A.     Yes.**  (Ahle Dep.3.)

*Larry Hunter:*

>  Q:     And did you understand that you were being paid a salary as opposed to an hourly wage?
>  **A:     Yes.**

>  Q:     And did you understand and agree that that salary was to pay you for all of the time that you spent performing your job?
>  **A:     Yes.**  (Hunter Dep.13.)

*Xavier Cruz:*

>  Q:     And you understood that the salary that you were being paid was for all the time that you spent performing your job for Veracity?
>  **A:     Yes.**  (Cruz Dep.10.)

Q:   No one told you that you'd be paid overtime, correct?
A:   **No.**  (Cruz. Dep.14.)

Q:   So the number of hours that you worked from week to week varied?
A:   **Yes.**
     . . .
Q:   Regardless of how many hours you may have worked in a week or not, you still got paid your salary, right?
A:   **Yes.**  (Cruz Dep.76.)

*Paul Romero:*

Q:   . . . You got paid a salary, so you got paid whether you worked or you didn't work, right?
A:   **Yes.**  (Romero Dep.124.)

Q:   Did you have regular hours every  week?
A:   **No.  They fluctuated through the week. . . .** (Romero Dep.143)

Q:   Did you have days off during the week?
A:   **Sometimes, yes.**

Q:   And what days were those, typically?
A:   **There was no typical days off.**

Q:   It was just random?
A:   **Could be anywhere.**  (Romero Dep.179.)

*Michael Blais:*

Q:   And you understood that the salary that you were being paid compensated you for all the time that you were spending performing your services for VRC, correct?
A:   **Yes.**  (Blais Dep.31.)

*William Szkutnicki:*

Q:   The next paragraph says, "This full-time, exempt salaried position does not have regular hours and/or days on or off and each employee's schedule may be changed at any time with any given pay period."  Does that reflect your understanding of how your hours and schedule would work when you started with VRC?
A:   **Yes.**

34

Q:   Is that how your hours and schedule did work?  It varied?
A:   **Yes.**  (Szkutnicki Dep.44.)

*Miguel Soto:*

A:   **I would complete surveillance approximately ten to 8 the ten hours per day that I was working.**

Q:   Ever less?
A:   **Yes.**

Q:   Okay.  Sometimes it was determined by whether you had to break a case early because there was nothing going on is that fair?
A:   **Correct.**

Q:   Was it your understanding when you started with VRC that your hours would fluctuate?
A:   **Yes.**  (Soto Dep.22.)

There is nothing in the record that contradicts the mutual understanding VRC had with its investigators: that they were paid a salary which compensated them for all hours worked, no matter how those hours may have fluctuated.

Moreover, by working variable hours and accepting their salaries each pay period, Plaintiffs confirmed their agreement to be paid a fixed salary for all hours worked.  See Braddock v. Madison County, 34 F. Supp. 2d 1098, 1105 (S.D. Ind. 1998) (finding a clear mutual understanding where "[t]he plaintiffs all continued to work for years" and received fixed amount of pay regardless of the number of hours worked); Zoltek v. Safelite Glass Corp., 884 F. Supp. 283, 286 (N.D. Ill. 1995) (holding that employee impliedly consented to payment at a fixed sum per week regardless of the hours worked, where for almost 2½ years the parties conducted themselves as if the employee was properly classified as FLSA-exempt and the employee never protested that "[h]is hours

per week varied considerably [but] his paycheck was always the same."). Here, Plaintiffs received their paychecks and did not complain to VRC about not being paid overtime. (See Ahle Dep.74, 239; Hunter Dep.20; Szkutnicki Dep.142.)

ii.     **The Parties' "clear understanding" must concern only a _fixed salary for fluctuating hours_, not overtime payment.**

The "clear understanding" factor does not require a clear understanding that an overtime premium will be paid—which necessarily is absent in a misclassification case. Courts and the U.S. Department of Labor agree that the requisite "clear understanding" must only concern the payment of a fixed salary for fluctuating hours. There simply is no requirement the understanding must also concern the overtime premium.

Federal courts have concluded that the fluctuating workweek regulation does not require an understanding about the overtime premium, holding "the regulation calls for no such enlarged understanding." Valerio v. Putnam Assoc. Inc., 173 F.3d 35, 40 (1st Cir. 1999). Instead, the regulation means "[t]he parties must only have reached a 'clear mutual understanding' that while the employee's hours may vary, his or her base salary will not." Id.; see also Clements v. Serco Inc., 530 F.3d 1224 (10th Cir. 2008) (holding that the court's only inquiry is whether the parties had a clear and mutual understanding that they would be paid on a salary basis for all hours worked); Bailey v. County of Georgetown, 94 F.3d 152 (4th Cir. 1996) (rejecting the proposition that "an employee must also understand the manner in which his or her overtime is calculated").

In Perez v. RadioShack Corp., 2005 WL 3750320 (N.D. Ill. Dec. 14, 2005), the court addressed the damages calculation to be used in an alleged misclassification case

brought by RadioShack store managers.  The court concluded a half-time calculation under the fluctuating workweek method could be the appropriate method for calculating unpaid overtime if the evidence established a clear understanding the employees would receive a fixed salary regardless of the number of hours worked each week, and that the hours would vary from week to week. Id. at *6-7; see also Mayhew v. Wells, 125 F.3d 216, 219-220 (4th Cir. 1997) (requiring a clear mutual understanding "that the fixed salary is to be compensation for all straight time hours worked" and that it did not matter whether employee understood the employer's "comp-time" arrangement for overtime hours because "such an understanding is not necessary"); Tumulty v. Fedex Ground Package Sys., Inc., 2005 WL 1979104, at *4 (W.D. Wash. Aug. 16, 2005) ("The parties must only have reached a clear mutual understanding that while the employee's hours may vary, his or her base salary will not.") (internal quotations omitted).

In 2009, the U.S. Department of Labor reiterated its support for the fluctuating workweek method of calculating back overtime owed, stating, "the Department's regulations do not require that the 'clear and mutual understanding' extend to the method used to calculate the overtime pay." DOL, Wage & Hour Op. Ltr., FLSA2009-3 (Jan. 14, 2009).  Courts in this jurisdiction have also recently held that the fluctuating workweek method applies to calculate the plaintiffs' overtime in a FLSA misclassification case, concluding that "plaintiffs had a 'clear understanding' of the fixed nature of their compensation," where the parties had agreed that the plaintiffs were paid a fixed salary to work a varied schedule.  Fenton v. Farmers Ins. Exchange, No. 07-cv-4864 (D. Minn. Sept. 29, 2009); see also Brask v. Heartland Auto. Servs., Inc., 2006 WL 2524212, at *2

(D. Minn. Aug. 15, 2006) (holding, in approving settlement of a misclassification case, "damages would likely be calculated using the fluctuating workweek method for overtime pay").

### iii. The fluctuating workweek methodology does not require "contemporaneous" overtime payments when calculating unpaid overtime due.

Any suggestion by Plaintiffs that contemporaneous overtime payments are a prerequisite to the fluctuating workweek method is likewise unsupported by the language of the regulation and the majority of the cases to address the issue.

First, the regulation itself says nothing about "contemporaneous" payment. The regulation simply requires "extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay." 29 C.F.R. § 778.114. Likewise, there is no contemporaneous payment requirement in any of the other FLSA regulations that provide for overtime to be calculated at one-half of the regular rate. See, e.g., 29 C.F.R. § 778.109 (regular and overtime rates); 29 C.F.R. § 778.110(b) (hourly rate and bonuses); 29 C.F.R. § 778.118 (overtime rate for commission-based employees).

Further, "[n]othing in the language of § 778.114 mandates that the fluctuating workweek method of calculation is precluded where the overtime payments are awarded retroactively as a remedy." Perez, 2005 WL 3750320, at *8 (rejecting contemporaneous payment requirement and allowing FWW method as unpaid overtime calculation method in misclassification case); see also Tumulty, 2005 WL 1979104, at *4-5 (explicitly rejecting contemporaneous payment requirement). Other courts, both explicitly and

implicitly (by allowing use of the half-time method for calculating unpaid overtime), reject a requirement of contemporaneous payment of overtime.  See, e.g., Brask, 2006 WL 2524212, at *2 (D. Minn. Aug. 15, 2006) (referring to the fluctuating workweek method as a method of calculating *damages*); Missel, 316 U.S. at 580 (discussing fluctuating workweek with no mention of a "contemporaneous" payment); Valerio, 173 F.3d at 39-40 (applying fluctuating workweek in misclassification case).[8]   The permissibility of retroactive, make-up overtime payments under the fluctuating workweek has been recognized by the DOL:

> Since straight time compensation has already been paid, such an employee must receive additional OT compensation for each OT hour in a particular w/w computed at not less than one-half the regular rate obtained by dividing the weekly salary by the number of hours worked in that w/w. If the employer to avoid weekly computations chooses to pay extra half-time based on the salary divided by 40 hours, such a method is permissible.

DOL Field Operations Handbook § 32b04b(a); see also DOL Op. Ltr., 1996 WL 1005216 (July 15, 1996) (allowing after-the-fact make up overtime payments without jeopardizing employer's use of fluctuating workweek).

VRC's investigators were paid a salary that they understood was intended to compensate them for all hours worked, regardless of what those hours were.  Therefore,

---

[8]   See also Mayhew v. Wells, 125 F.3d 216, 219-20 (4th Cir. 1997) (using half-time calculation for employee who received a fixed salary for fluctuating hours where "in no case was overtime ever paid in money"); Blackmon, 835 F.2d at 1137-39 (applying fluctuating workweek in misclassification case); Yadev v. Coleman Oldsmobile, Inc., 538 F.2d 1206, 1207 (5th Cir. 1976) (per curiam) (same); Tumulty, 2005 WL 1979104, at *5 (rejecting contemporaneous payment requirement); Perez, 2005 WL 3750320 at *8 (same); Martin v. David T. Saunders Constr. Co., 813 F. Supp. 893, 900 (D. Mass. 1992) (referring to fluctuating workweek as a method to calculate "damages"); Knight v. Morris, 693 F. Supp. 439, 445 (W.D. Va. 1988).

VRC respectfully requests a determination on summary judgment that the fluctuating workweek method of calculating overtime will apply if Plaintiffs establish that they are owed overtime.

## CONCLUSION

Based upon the foregoing, Defendant Veracity Research Co. respectfully requests that this Court grant its Motion for Partial Summary Judgment in its entirety.


Dated:  May 13, 2010                          s/Lindsay J. Zamzow
                                              Joseph M. Sokolowski (#178366)
                                              Lindsay J. Zamzow (#314705)
                                              Krista A.P. Hatcher (#387825)
                                              Pamela Abbate-Dattilo (#389889)
                                              FREDRIKSON & BYRON, P.A.
                                              200 South Sixth Street, Suite 4000
                                              Minneapolis, MN  55402
                                              Phone: (612) 492-7000

                                              *Attorneys for Defendant Veracity Research Co.*