# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Douglas Ahle, Andrew Jordan, and
William Wiseman, individually and
on behalf of others similarly situated,

        Plaintiffs,            **MEMORANDUM OPINION
AND ORDER**

      v.                      Civil No. 09-0042 ADM/RLE

Veracity Research Co.,

        Defendant.

---

Matthew H. Morgan, Esq., Reena I. Desai, Esq., Donald H. Nichols, Esq., Paul J. Lukas, Esq.,
and Robert L. Schug, Esq., Nichols Kaster, PLLP, Minneapolis, MN on behalf of Plaintiffs.

Joseph M. Sokolowski, Esq., Krista A.P. Hatcher, Esq., and Lindsay J. Zamzow, Esq.,
Fredrikson & Byron, PA, Minneapolis, MN, on behalf of Defendant.

---

# I. INTRODUCTION

In their Complaint [Docket No. 1], Plaintiffs Douglas Ahle ("Ahle"), Andrew Jordan

("Jordan"), William Wiseman ("Wiseman"), and the opt-in Plaintiffs (collectively "Plaintiffs")

assert claims against Defendant Veracity Research Co. ("Veracity") for violations of the Fair

Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219.  On June 24, 2010, the

undersigned United States District Judge heard oral argument on the parties' Cross-Motions for

Partial Summary Judgment [Docket Nos. 183 and 191].  On July 30, 2010, oral argument was

heard on Defendant's Motion to Decertify [Docket No. 231].  For the reasons stated herein,

Plaintiffs' partial summary judgment motion is granted in part and denied in part, Veracity's

partial summary judgment motion is granted in part and denied in part, and Veracity's motion to

decertify is denied.

## II. BACKGROUND[1]

Veracity is a full-service investigative firm specializing in insurance defense investigations. Answer to Compl., Defenses and Am. Counterclaim (Counterclaim) [Docket No. 29] ¶ 5. Named Plaintiffs Ahle, Jordan, and Wiseman formerly worked as investigators for Veracity. Id. ¶¶ 6-8; Collective Action Compl. [Docket No. 1] ¶¶ 4-6. Approximately 150 other individuals have opted into this litigation. The plaintiff class members are current or former investigators for Veracity.

Veracity is hired by insurance companies, third-party administrators, and law firms to investigate suspect claims. Morgan Decl., May 13, 2010 [Docket No. 186], Ex. 1 (Foster Dep.) 45:22-46:8. Veracity categorizes its investigators by title and level; the titles and levels that are at issue in this litigation are surveillance investigators (levels 1-3), claims investigators (level 4), and senior field investigators (level 5). Morgan Decl., May 13, 2010, Ex. 2 (Doyle Dep.) 60:10-19. Surveillance investigators primarily work in the field conducting surveillance, undercover investigations, and background checks. Id. 50:15-21; Foster Aff., July 7, 2009 [Docket No. 59], ¶ 7. Claims investigators generally perform the same duties as surveillance investigators, but they also interview witnesses, obtain statements, take photographs, and, occasionally, perform sales functions. Foster Aff., July 7, 2009, ¶¶ 8, 10-11. Senior field investigators supervise and manage surveillance and claims investigators in the field, train new investigators, and perform occasional promotion and sales duties. Id. ¶ 13. Thus, all of the titles and levels of investigators at issue have in common some surveillance duties, although the parties dispute whether the

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). As both parties have moved for summary judgment, any disputed facts are noted.

primary duty of investigators in each of these titles and levels is surveillance.

After receiving an assignment from Veracity but before driving to the surveillance site, the investigator typically completes several tasks including reviewing the assignment sheet, performing a background check on the subject, matching the name of the subject to an address, mapping out directions to the surveillance site, and ensuring that the investigator's camera, laptop computer, and cellular phones are fully charged. Morgan Decl., May 13, 2010, Ex. 8 at VRC001063-64. According to Plaintiffs, investigators also are required to perform maintenance including cleaning the windows and filling the fuel tank on their vehicles before leaving for a surveillance site. Morgan Decl., May 13, 2010, Exs. 13, 14, ¶ 6. At the surveillance site, investigators monitor and video record the subject and take notes of their observations. Morgan Decl., May 13, 2010, Ex. 13, ¶ 5. Claims investigators may also interview witnesses, obtain statements, and collect documents. Foster Dep. 149:7-23.

Investigators record their activities in a daily investigative report ("DIR"). Morgan Decl., May 13, 2010, Exs. 13, 14 ¶ 7. An investigator's DIR discloses when the investigator left home for the surveillance site, the drive time, the arrival time, observation notes, the departure time from the site, and the arrival time back at the investigator's home. Id. Once completed, the investigator sends the DIR online to Veracity. Id. Investigators send any video recording taken during the day to their managers by depositing the tapes at a FedEx drop-off location. Id.

The dispute in this action centers on whether Plaintiffs, given their daily duties, were properly classified as FLSA "exempt" employees who are not required to be paid overtime for work in excess of forty hours per week. Based on Veracity's founders' view of the "industry standard," Veracity classified its investigators as exempt when it began business in 1995. Doyle

Dep. 15:10- 17:6.   Plaintiffs initiated this action on January 8, 2009, claiming that they were improperly classified as exempt and, therefore, were wrongfully denied compensation for overtime hours allegedly worked while employed by Veracity as investigators.

## III. DISCUSSION

**A.     Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

Plaintiffs move for summary judgment on the applicability of several exemptions from the FLSA's wage and hours requirements; Veracity seeks summary judgment on Plaintiffs' travel time claims, the applicability of the fluctuating workweek method of calculating damages, and the issue of whether a two or three-year statute of limitations applies to Plaintiffs' claims; and both parties move for summary judgment on the issue of liquidated damages.

**1.     The Applicability of Exemptions**

Plaintiffs challenge the applicability of three exemptions from the FLSA's minimum

4

wage and maximum hours requirements that have been raised in this lawsuit: the administrative

exemption, the outside sales exemption, and the motor carrier exemption. The "'general rule [is]

that the application of an exemption under the [FLSA] is a matter of affirmative defense on

which the employer has the burden of proof.'" Hertz v. Woodbury County, 566 F.3d 775, 783

(8th Cir. 2009) (quoting Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974)) (first

alteration in original). Because of the remedial nature of the FLSA, exemptions are to be

"narrowly construed against the employers seeking to assert them and their application limited to

those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben

Kanowsky, Inc., 361 U.S. 388, 392 (1960).

### a. The Administrative Exemption

The wage and hour requirements of the FLSA do not apply to "any employee in a bona

fide . . . administrative capacity." 29 U.S.C. § 213(a)(1). United States Department of Labor

("DOL") regulations define an "administrative employee" as someone:

> (1) Compensated on a salary or fee basis at a rate of not less than
> $455 per week . . . , exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual
> work directly related to the management or general business
> operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and
> independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). There is no dispute the salary element of the definition is met. See Pls.'

Mem. in Supp. of Summ. J. [Docket No. 185] at 22-23. Plaintiffs maintain, however, that neither

the second nor the third elements of the definition are met.

Veracity responds there are three distinct groups of class members in this collective

action: those whose primary duty was surveillance investigations, those whose primary duty was claims investigations, and those whose primary duty was something other than investigations. See Def.'s Mem. in Opp'n to Summ. J. [Docket No. 211] at 26-36. Veracity does not advance any argument regarding the first group, apparently acknowledging that those individuals do not qualify for the administrative exemption, and instead focuses its arguments on the second and third groups. See id.

### i. Individuals with Claims Investigation as a Primary Duty

*Directly Related to the Management or General Business Operations*

DOL regulations explain that the work contemplated by the phrase "directly related to the management or general business operations" is "work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). This distinction has led to the so-called "administrative-production dichotomy," an analytical tool that courts have relied on to determine whether an employee's primary duty is directly related to management or general business operations. Although the administrative-production dichotomy is an imperfect analytical tool in a service-oriented employment context, it "is still a useful construct." Desmond v. PNGI Charles Town Gaming, L.L.C., 564 F.3d 688, 694 (4th Cir. 2009).

> "[A]pplying the administrative-production dichotomy is not as simple as drawing the line between white-collar and blue-collar workers. On the contrary, non-manufacturing employees can be considered 'production' employees in those instances where their job is to generate (i.e., 'product') the very product or service that the employer's business offers to the public.

Id. (quoting Reich v. John Alden Life Ins. Co., 126 F.3d 1, 9 (1st Cir. 1997)) (alteration in

original).

The parties agree Veracity's core function is to provide investigations for its customers. Plaintiffs argue that their primary duty as surveillance investigators (levels 1-3), claims investigators (level 4), and senior field investigators (level 5) was to produce those investigations and, thus, they clearly fall on the production side of the dichotomy. Veracity responds that the administrative-production dichotomy has limited value in a case involving a service industry. But, if applied here, Veracity argues, the duty of conducting claims investigations is directly related to the management or general business operations of Veracity's *clients*. Therefore, Veracity asserts its investigators meet the second element of the DOL regulations' definition of administrative employees.

In support of its argument, Veracity cites the Seventh Circuit's decision in <u>Roe-Midgett v. CC Services, Inc.</u>, 512 F.3d 865 (7th Cir. 2008). There, the court was presented with the issue of whether the plaintiffs—employees working as insurance claims adjusters for the defendant, a company that contracted with insurance companies to provide claims processing services—were administrative employees. <u>Id.</u> at 867. Addressing the second element of the definition of administrative employees, the court concluded the plaintiffs' primary duty of adjusting insurance claims was directly related to the general business operations of the defendant's clients because claims adjusting was ancillary to the production of the insurance policies being sold by the clients. <u>Id.</u> at 872. The court noted that DOL regulations make it clear that "'insurance claims adjusters generally meet the duties requirements for the administrative exemption, *whether they work for an insurance company or other type of company*.'" <u>Id.</u> (quoting 29 C.F.R. § 541.203(a).

Veracity's business is to provide claims investigations to its clients, and, therefore, employees conducting claims investigations are properly viewed as "producing" those investigations. But the core business function of Veracity's clients is not to produce investigations. For example, Veracity's insurance company clients are in the business of writing and selling insurance policies. The duty of conducting claims investigations is merely ancillary to producing and selling insurance policies, and thus falls on the administrative side of the "administrative-production dichotomy." See Roe-Midgett, 512 F.3d at 872; see also Adams v. United States, 78 Fed. Cl. 536, 542 (Fed. Cl. 2007) (indicating that the administrative exemption applies to employees whose position provides a service ancillary to the primary function of the organization for which they work); Renfro v. Indiana Michigan Power Co., 370 F.3d 512, 517 (6th Cir. 2004) ("When employees engage in work that is 'ancillary to an employer's [or an employer's clients'] principal production activity,' those employees are administrative.") (quoting Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 904 (3d Cir. 1991)); Reich, 126 F.3d at 14 (affirming a district court's determination that marketing representatives of an insurance company qualified under the administrative exemption because their primary duty was "clearly ancillary" to the company's principal production activity, creating insurance policies); Haywood v. N. Am. Van Lines, Inc., 121 F.3d 1066, 1072 (7th Cir. 1997) (highlighting that the plaintiff's primary duty, negotiating with customers when there was a complaint, was ancillary to the employer's business, moving household goods from one location to another). Therefore, the second element of the definition of administrative employees is met as to those individuals whose primary duty was claims investigations.

The Court is not persuaded that Gusdonovich v. Business Information Co., 705 F. Supp.

262 (W.D. Pa. 1985), cited by Plaintiffs, compels a different conclusion. The defendant in Gusdonovich was a company that investigated and collected information for insurance companies, businesses, and individuals, and the plaintiff in Gusdonovich was a former investigator employed by the defendant. Id. at 263. The court concluded that the defendant's business was "'producing' information for its clients," "the plaintiff's duties consisted almost entirely of gathering that 'product,'" and, thus, the plaintiff was engaged in production as opposed to administrative duties. Id. at 265. Absent from the analysis, however, is any discussion of the relationship between the plaintiff's primary duties and the core business function of the defendant's clients.

The Court also is not persuaded by the DOL opinion letter cited by Plaintiffs. See Dep't of Labor, Opinion Letter No. FLSA2005-21 (Aug. 19, 2005), available at http://www.dol.gov/whd/opinion/flsa.htm (follow "2005" hyperlink; then follow FLSA2005-21 "PDF" hyperlink) (hereinafter "2005 Opinion Letter"). The 2005 Opinion Letter concludes that the investigators working for a company that had contracted with the Defense Security Service, an agency of the Department of Defense, to provide background investigations were related to the company's core business function of providing investigative services rather than its management or general business operations. Id. at 4. However, the 2005 Opinion Letter does not address whether the investigators' work should be viewed as related to DSS's (the client's) management or general business operations, concluding that regardless of the resolution of that issue, the third element of the definition of administrative employees would not be met. Id.

*Discretion and Independent Judgment*

Although claims investigations is directly related to the management or general business

9

operations of Veracity's *clients*, such a primary duty must also involve the exercise of discretion

and independent judgment with respect to matters of significance for claims investigators to meet

the final element of the definition of administrative employees. DOL regulations explain that

"the exercise of discretion and independent judgment involves the comparison and the evaluation

of possible courses of conduct, and acting or making a decision after the various possibilities

have been considered." 29 C.F.R. § 541.202(a).

> Factors to be considered when determining whether an employee
> exercises discretion and independent judgment with respect to
> matters of significance include, but are not limited to: whether the
> employee has authority to formulate, affect, interpret, or implement
> management policies or operating practices; whether the employee
> carries out major assignments in conducting the operations of the
> business; whether the employee performs work that affects business
> operations to a substantial degree, even if the employee's
> assignments are related to operation of a particular segment of the
> business; whether the employee has authority to commit the employer
> in matters that have significant financial impact; whether the
> employee has authority to waive or deviate from established policies
> and procedures without prior approval; whether the employee has
> authority to negotiate and bind the company on significant matters;
> whether the employee provides consultation or expert advice to
> management; whether the employee is involved in planning long- or
> short-term business objectives; whether the employee investigates
> and resolves matters of significance on behalf of management; and
> whether the employee represents the company in handling
> complaints, arbitrating disputes or resolving grievances.

Id. § 541.202(b). "The exercise of discretion and independent judgment implies that the

employee has the authority to make an independent choice, free from immediate direction or

supervision," but "employees can exercise discretion and independent judgment even if their

decisions or recommendations are reviewed at a higher level," and discretion and independent

judgment can "consist of recommendations for action rather than the actual taking of action." Id.

§ 541.202(c). However, "[t]he exercise of discretion and independent judgment must be more

than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." Id. § 541.202(e).

In support of their argument that the duties of the claims investigators do not involve the exercise of discretion and independent judgment regarding matters of significance, Plaintiffs again cite Gusdonovich, as well as Fenton v. Farmers Insurance Exchange, 663 F. Supp. 2d 718 (D. Minn. 2009), a case from this district. In Gusdonovich, the court concluded that the insurance "investigators were merely applying their knowledge and skill in determining what procedure to follow, which . . . is not the exercise of discretion and independent judgment contemplated by the [DOL] regulation[s]." 705 F. Supp. at 265.

The plaintiffs in Fenton were insurance investigators employed by a company to investigate potentially fraudulent insurance claims. 663 F. Supp. 2d at 721. The court held that the job duties of such "special investigators" did not involve a sufficient exercise of discretion and independent judgment to qualify for the administrative exemption. Id. at 726. Instead, the special investigators' job duties were "sufficiently aligned with the employment circumstances" of (1) the insurance investigators who were the plaintiffs in Gusdonovich, (2) the employees performing background investigations discussed in the 2005 DOL Opinion Letter, and (3) the police investigations addressed in DOL regulation 29 C.F.R. § 541.3(b)(1).[2] Id. at 726. In reaching that conclusion, the court noted that the employer's written guidelines explained in great detail how the investigators should approach issues that often arise in conducting and

_____

[2] Section 541.3(b)(1) provides, in part, that investigators working in law enforcement are not exempt when they "perform such work as . . . conducting investigations or inspections for violations of law; performing surveillance . . . interviewing witnesses . . . preparing investigative reports; or other similar work."

documenting an investigation, there was "nothing in the residual discretion available to investigators that [was] sufficient to justify exemption," and there was no dispute that the investigator's subjective opinions and conclusions were excluded from their written reports. Id. at 726-27. In addition, written guidelines instructed the investigators to include, with equal detail and emphasis, all inculpating and exculpating information in their reports, and investigators had no authority to determine whether a claim should be denied or whether the insurance company should seek to negotiate a settlement. Id. at 727.

Like in Gusdonovich and Fenton, Plaintiffs' duties as claims investigators for Veracity do not involve a sufficient degree of discretion and independent judgement with respect to matters of significance. Claims investigators do not have the discretion to decide when to conduct an investigation, where to conduct it, or the length of time to spend on it. Morgan Decl., May 13, 2010, Ex. 13, ¶ 6. In addition, Veracity does not allow claims investigators to (1) make any recommendations or give their opinions as to whether fraud occurred when submitting their DIRs or (2) recommend or participate in the decision whether to deny or pay a claim or whether to conduct further investigation. Id. ¶ 8. Furthermore, Plaintiffs' declarations state that they received guidelines and manuals describing how claims investigations are conducted and that they are "expected to follow such guidelines and manuals when conducting day-to-day investigations." Id. ¶ 11. For example, a Veracity document entitled "Introduction to Claims Investigation and Responsibilities" informs claims investigators as follows:

> Your job will be to obtain facts that relate to a specific claim. This will include, but is not limited to, taking recorded statements from the person making the claim . . ., witnesses to the specific incident, [and] persons that may have direct knowledge about the incident . . . . Your responsibility is to get the facts of the case by means of questioning or research. At times you will be called upon to obtain

needed documentation to include medical records, receipts . . ., employment information, and police reports. You will have to develop comprehensive investigative and communication skills, and you must be able to decide which leads must be followed, and which ones should be reported but need no further effort.

One of the most challenging areas of [your job as a claims investigator] will be your ability to transfer the information that you gather into a coherent and informative report. . . . [I]n most cases you will not have the opportunity to speak directly with the client and therefore your report must be accurate, concise, easily understood, and complete.

Morgan Decl., May 13, 2010, Ex. 9 at VRC001154.

The manual includes outlines to follow when taking a recorded statement in all investigations and in particular types of investigations (e.g., employment injuries, motor vehicle accidents resulting in deaths, products liability, property loss or theft, vehicle or property damage). Id. at VRC001167, 1176, 1216, 1230, 1233, 1240. Although claims investigators are not required to follow the outlines verbatim, the outlines do command, in several instances, that some specific information is not optional, employing language such as, "must be on every recorded statement," "must be covered," or "must be asked." Id. at VRC001167, 1176, 1216, 1230, 1233, 1240. Furthermore, the outlines instruct investigators to "obtain all of the facts," and remind the claims investigators that it is Veractiy's responsibility to "obtain the information and then let the [client] and their legal department make the determination." Id. at VRC001230.

The record establishes that (1) Veracity's written guidelines explain in great detail how claims investigators should conduct an investigation, (2) the claims investigators are required to obtain all the facts regardless of their impact, and (3) the claims investigators do not include their own opinions, conclusions, or recommendations regarding the decision whether to pay or deny the claim. Because the claims investigators do not provide opinions and conclusions about their

investigative observations, they are significantly different than the insurance investigators in

Foster v. Nationwide Mutual Insurance Co.  See 695 F. Supp. 2d 748, 761 (S.D. Ohio 2010)

(concluding that genuine issues of material fact exist as to whether the plaintiffs, insurance

investigators, exercised discretion and independent judgment because "[m]ost significantly, there

is a factual dispute as to whether Special Investigators' primary duty encompasses providing

their opinions and conclusions regarding their investigative findings").[3]  Admittedly, claims

investigators do make decisions regarding the precise manner in which they conduct an

investigation—creating action plans, deciding who to interview, what documents to review, what

leads to follow, and whether to recommend hiring an expert—however, such decisions are more

appropriately viewed as choices among "established techniques, procedures or specific standards

described in manuals or other sources," which do not amount to the exercise of discretion and

independent judgment with respect to matters of significance.  29 C.F.R. § 541.202(a), (e); see

also 2005 Opinion Letter at 4-5 (advising that "prioritizing the pursuit of particular leads,

assessing whether the leads . . . have provided information that requires further investigation,

determining which potential witnesses to see and which documents to review, and making

_____

[3] Although Veracity twice represents that claims investigators "routinely provide
[Veracity's] clients with their subjective evaluations and opinions regarding claims," Def.'s
Mem. in Opp'n to Summ. J. at 33, 35, Veracity fails to provide any citation to the record in
support of this representation.  It appears that the basis for Veracity's representation may be
evidence showing that claims investigators occasionally convey to Veracity's clients their own
subjective opinions or conclusions regarding the credibility of the individuals they interview, and
that such information can be a significant factor in the client's ultimate decision regarding the
claim.  See Foster Aff., June 3, 2010 [Docket No. 212] ¶¶ 5, 9, 10; Zamzow Aff., June 3, 2010
[Docket No. 213], Ex. FF at VRC021820.  However, a claims investigator offering his view of
the credibility of a claimant or witness is not equivalent to including his subjective opinion or
recommendation as to whether the claim is legitimate or fraudulent and whether it should be paid
or denied.  Compare Fenton, 663 F. Supp. 2d at 722-23 with Foster, 695 F. Supp. 2d at 762.

similar decisions that promote effective and efficient use of . . . work time in performing assigned investigative activities" do not involve the exercise of discretion and independent judgment with respect to matters of significance); Auer v. Robbins, 519 U.S. 452, 461 (1997) (stating that the DOL's interpretation of its own regulations are "controlling unless plainly erroneous or inconsistent with the regulation").

The cases cited by Veracity are unavailing. In Stout v. Smolar, the court viewed evidence that a private investigator had the authority to make decisions as to how to "investigate the scene of an accident, including determining what materials to be preserved and whether expert witnesses would be required" as showing that the investigator exercised discretion and independent judgment. No. 1:05-CV-1202, 2007 WL 2765519, at *6 n.2 (N.D. Ga. Sept. 18, 2007). The court also commented that treating insurance investigators as not qualifying for the administrative exemption "would appear contrary to the insurance claims adjuster example of administrative exemption cited by the [DOL]." Id. This Court finds more persuasive the reasoning in DOL regulations, cases such as Fenton, and the 2005 Opinion Letter, which suggest that having discretion over the types of matters discussed in Stout does not equate to having discretion and independent judgment with respect to matters of significance. See Foster, 695 F. Supp. 2d at 761 (recognizing, in light of the 2005 Opinion Letter, that deciding who to interview, what documents to review, what leads to pursue, and "similar tactical matters" were "fact-finding logistics [that] do not necessarily rise to the level of discretion and independent judgment contemplated by DOL regulations, for they do not amount to matters of significance").

Equating Veracity's claims investigators to claims adjusters is not a fair comparison or

particularly helpful.[4]  The core function of a claims adjuster is to decide whether and to what

extent an insurance claim should be paid, a task that requires considerable exercise of discretion

on a matter of significance.  Inclusion of the term "adjuster" in the title of the job strongly

suggests that conclusion.  All employees exercise some discretion in deciding how to perform

their jobs, and the way in which they exercise that discretion likely will affect matters of

significance.  In the case of claims investigators, how they exercise their discretion in conducting

an investigation will impact or affect how a claims adjuster working for one of Veracity's clients

decides the significant matter of the value of the claim.  But an exercise of discretion that

*impacts or affects* a matter of significance is not exercising discretion *with respect to* a matter of

significance.  If the rule were otherwise, all employees would arguably meet the third element of

the definition of administrative employees.  Because the analogy to claims adjusters is not

persuasive, Veracity's reliance on cases such as Roe-Midgett, 512 F.3d at 874, where the

Seventh Circuit held that claims adjusters routinely used their discretion and independent

judgment to make choices that impact damage estimates, settlement, and other matters of

significance, does not alter the result here.

The Court concludes that Veracity has failed to demonstrate a triable issue as to whether

the duties of claims investigators include the exercise of discretion and independent judgment

with respect to matters of significance.  Because claims investigators do not meet the third

element of the definition in 29 C.F.R. § 541.200(a), they do not qualify for the administrative

---

[4] DOL regulation 29 C.F.R. § 541.203(a) addresses claims adjusters, not claims
investigators.  The regulation provides that claims adjusters "generally meet the duties
requirement for the administrative exemption."  Id.  It does not address whether claims adjusters
meet the discretion and independent judgment requirement.

exemption.

### ii. Individuals Claimed to Have Primary Duties Other than Investigations

The next group of class members are those who, according to Veracity, have primary duties other than surveillance or claims investigations. Veracity contends that "[m]any Plaintiffs, despite having the word 'investigator' in their job title, had very different primary duties, which also qualify as exempt," including client account management; supervising, training, and managing other investigators; performing quality control checks; recruiting; and hiring. Def.'s Mem. in Opp'n to Summ. J. at 35-36. Specifically, Veracity maintains that class members Ed Hiser, Gregory Hinson, and Kenneth Pearce routinely discussed case management and assignments with clients; Miguel Soto scheduled and managed employees and reviewed their performance; Larry Higgins and Charles Boudreaux trained other investigators; and Jamie Espitia, Pearce, and Soto performed quality control checks for Veracity.

Three reasons lead the Court to conclude that Veracity has failed to demonstrate the existence of a genuine issue of material fact as to whether these identified individuals qualify for the administrative exemption. First, the evidence cited by Veracity does not show that the duties being performed by this subset of individuals were accurately characterized by Veracity. In support of its assertion that Hiser had considerable account management duties, Veracity cites an email from Hiser to another Veracity employee, presumably Hiser's superior:

> I spoke with Cheryl Kane from BJC Healthcare late this afternoon and she really needs this claims case done ASAP so they can make a determination as to whether the claimant's injury is compensatory. I have three interviews scheduled for the early afternoon on Thursday and am attempting to schedule the claimant's for Thursday morning . . . . I know you wanted surveillance work done on this date but there were few options. Rich and I have an excellent rapport with

> Cheryl & Peg and she really stressed that this assignment needed to
> be completed due to time restrictions for the compensatory decision.

Zamzow Aff., June 3, 2010, Ex. Q at VRC226138.  Rather than illustrating that Hiser was performing account management, this email coordinates with a fellow employee and the client regarding the logistical complications of when the investigation should be scheduled.  Second, "[t]he term 'primary duty' means the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Even if the email shows that Hiser was performing account management (and even if account management is properly viewed as administrative in nature), no evidence has been adduced to show that performing such work amounted to Hiser's primary duty in terms of the "relative importance" of that work or the "amount of time spent performing" that work in comparison to other types of work.  Id.  Finally, assuming for the sake of argument that the email creates a fact issue as to whether Hiser was performing exempt, account management tasks and that working on such tasks constituted his primary duty, the email appears to be asking a superior for permission to follow a proposed course of action and thus undermines the notion that Hiser exercised discretion and independent judgment in performing those duties.

As to Hinson, Veracity claims that "[h]e was also the point-person for new files with respect to at least one major [Veracity] client."  Def.'s Mem. in Opp'n to Summ. J. at  11.  The evidence cited in support of this claim is an email between Hinson and a client, in which the client states that she has a new investigation regarding a car theft and that Hinson should obtain a copy of the police report, a statement from the insured, and an explanation why the theft was not reported to the police or the insurer sooner.  Zamzow Aff., June 3, 2010, Ex. T at VRC276812. At the top of the page cited by Veracity is Hinson's response: "I really appreciate the

opportunity to serve your needs. As we discussed I have inputed your request and spoke to the responsible manager. We should have this case completed with in [sic] a two week time frame." Id. Although Hinson might be "point-person" for this single new investigation from one client and may have performed work directly related to the management or general business operation, Hinson still is not qualified for the administrative exemption. The email itself evinces that Hinson did not have the discretion and independent judgment to decide whether to bind Veracity to the significant matter of accepting a new investigation from a client.

Veracity cites a time-log for Pearce, showing that Pearce was conducting sales activities, discussing cases with clients, and meeting with clients.[5] Zamzow Aff., June 3, 2010, Ex. E. However, nothing in the log, which spans only an eight-week period, shows that Pearce's *primary* duty is to perform such tasks (characterized by Veracity as administrative) and that he exercises discretion and independent judgment with respect to matters of significance in performing those tasks. The log also reflects Pearce conducted surveillance and interviewed witnesses, and Pearce's response to an interrogatory states that although he did spend time visiting potential clients, "approximately 80 percent of his time" was spent completing the job duties of a surveillance investigator. Id.; Desai Decl., June 10, 2010 [Docket No. 222], Ex. 2 at 11.

The documentary evidence cited by Veracity with regard to Higgins, Soto, Boudreaux, and Espitia, also is inadequate.[6] Assuming these individuals have performed work that arguably

---

[5] Veracity's apparent position is that whenever an investigator has any interaction with a client regarding an investigation, he or she is engaged in "account and client management."

[6] The evidence cited by Veracity regarding Boudreaux, presumably to show that his primary duty is the administrative work of training new investigators, is an email from a senior

was administrative in the sense that it directly related to management or general business operations, there is no evidence that performing such administrative work was their primary duty. Additionally, the evidence cited by Veracity again does not show these individuals exercised discretion and independent judgment with respect to matters of significance in performing such work.

There are no genuine issues of fact as to whether this group of individuals qualifies for the administrative exemption. Accordingly, summary judgment in favor of Plaintiffs on the applicability of the administrative exemption is warranted.

### b. The Outside Sales Exemption

The wage and hour requirements of the FLSA also do not apply to "[a]ny employee employed . . . in the capacity of outside salesman." 29 U.S.C. § 213(a)(1). DOL regulations define an outside salesperson as someone (1) whose primary duty is making sales within the meaning of section 3(k) of the FLSA or obtaining orders or contracts for services and (2) who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty. 29 C.F.R. § 541.500(a). In determining whether an employee's primary duty is outside sales, "work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work." Id. § 541.500(b). Likewise, "[o]ther work that

---

district manager informing Boudreaux that "[y]ou will have a new INV with you tomorrow and I will find out if we work a full day and let you know who later as well." Zamzow Aff., June 3, 2010, Ex. II at VRC1365111. When being deposed, Espitia recalled performing a quality control assignment, and when asked how many other quality control assignments he performed while working for Veracity, he responded, "I'm not sure, but maybe like one or two more just to see if someone was [where they were supposed to be]." Zamzow Aff., June 3, 2010, Ex. W 27:18-22.

furthers the employee's sales efforts also shall be regarded as exempt work." Id.

Plaintiffs argue that surveillance investigators, who comprise 84% of the class, did not participate in sales activities at all. As to the claims investigators, Plaintiffs maintain that although they did perform some sales-related activities, those activities did not rise to the level of their primary duty. Veracity responds that summary judgment on the applicability of the outside sales exemption is inappropriate because "a number of Plaintiffs" performed substantial outside sales work. Veracity concludes, therefore, that a triable issue remains as to whether exempt, outside sales work was the primary duty of claims investigators.

DOL regulations explain that "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b). Although time is "not the sole test," an employee who spends "more than 50 percent of [his] time performing exempt work will generally satisfy the primary duty requirement." Id. The proper time frame for evaluating an employee's primary duty is determined by the totality of the circumstances. See Counts v. S.C. Elec. & Gas Co., 317 F.3d 453, 456 (4th Cir. 2003) ("Nothing in the FLSA compels any particular time frame for determining an employee's primary duty. . . . It is clear from [the language of the regulations] that primary duty is meant to be assessed by the totality of the circumstances.").

Veracity cites evidence that arguably shows that within a defined time frame, a claims investigator may have spent a substantial portion of his time—perhaps even as much as 50% of his time—performing outside sales. For example, although Hinson stated in a response to an interrogatory that he spent the majority of his time performing the job of a surveillance investigator, he stated in an affidavit filed last year in connection with the conditional

certification motion that as a claims investigator, he "had considerable sales responsibilities on behalf of [Veracity]" and would "typically conduct sales activities three days a week and claims or surveillance investigation work two days a week." Hatcher Aff., July 10, 2009 [Docket No. 60], Ex. A at 11-13 (Hinson Aff., July 6, 2009) ¶¶ 2-3. Similarly, a work schedule provided by Veracity shows that Pearce may have performed sales work for as much as half of his time during a three-month period in late 2008. Zamzow Aff., June 3, 2010, Ex. F. However, Veracity fails to explain why such limited time frames (Hinson's stint as a claims investigator and Pearce's time during a selected three-month period), should be used as the relevant "yardstick by which primary duty is measured." Marshall v. W. Union Tel. Co., 621 F.2d 1246, 1252. Plaintiffs identify a more holistic approach, referring to the duration of Plaintiffs' employment with Veracity, and assert that during the entirety of their tenure, their primary duty (in terms of time spent) was investigations.

In addition, aside from the issue time spent on investigations versus sales, evidence shows that, in terms of importance, investigations was the primary duty of claims investigators. Plaintiffs note that Veracity's job description for its claims investigators includes an extensive list of "essential job functions" and all of these functions relate to conducting investigations or interacting with other Veracity employees and clients. Morgan Decl., May 13, 2010, Ex. 11. By contrast, sales does not warrant a mention in Veracity's job description for claims investigators.

For these reasons, Plaintiffs do not qualify for the outside sales exemption. Summary judgment in favor of Plaintiffs on the applicability of the outside sales exemption is granted.

### c. The Motor Carrier Exemption

The FLSA's overtime requirements do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service" pursuant to the provisions of the Motor Carrier Act ("MCA"). 29 U.S.C. § 213(b)(1). The DOL audited Veracity in 2001 and 2004 to review Veracity's classification of its investigators. Both times the audits concluded that the investigators were appropriately classified as qualifying for the motor carrier exemption in § 213(b)(1) because their jobs required them to "carry video and computer equipment across state lines to perform investigations." Doyle Dep. 20:19-21:6; Morgan Decl., May 13, 2010, Ex. 15.

When those audits were conducted, a "motor carrier" was defined as a "person providing motor vehicle transportation for compensation," and the motor carrier exemption "applied to all drivers operating in interstate commerce, regardless of the weight of the vehicle driven." Glanville v. Dupar, Inc., No. H-08-2537, 2009 WL 3255292, at *4 (S.D. Tex. Sept. 25, 2009) (citing 49 U.S.C. § 13102). In 2005, however, Congress changed the definition of "motor carrier." The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub.L. No. 109-59, § 4142, 119 Stat. 1144, 1747 (2005). SAFETEA-LU replaced the term "motor vehicle" with "commercial motor vehicle," and commercial motor vehicles are defined as vehicles having a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds. See Brooks v. Halsted Commc'ns, Ltd., 620 F. Supp. 2d 193, 197 (D. Mass. 2009) (citing 49 U.S.C. § 31132(1)(A)). Thus, employees of motor carriers operating vehicles weighing less than 10,001 pounds no longer qualified for the motor carrier exemption to the FLSA's overtime provisions. Id. at 197-98.

Congress passed the SAFETEA-LU Technical Corrections Act of 2008 ("TCA"), Pub.L. No. 110-244, §§ 305-06, 122 Stat. 1572, 1620-21 (2008), on June 6, 2008, restoring the previous definition of "motor carrier" but retaining the limitation on the applicability of the motor carrier exemption to motor vehicles weighing at least 10,001 pounds.  Id. at 198 (citations omitted). "To keep the plot interesting, however, Congress used the TCA to add another passageway to the maze."  Id.  The TCA included a safe-harbor provision that absolved employers of liability for any failure to pay FLSA-mandated overtime to "covered employees" during the period from August 10, 2005, to August 9, 2006, "provided the employer did not have actual knowledge that the scope of the exemption had changed."  Id.  The term "covered employee" means an individual who is employed by a "motor carrier" or "motor private carrier" and whose work, in whole or in part, is defined as (1) that of a driver, driver's helper, loader, or mechanic; and (2) affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce.  110 P.L. 244, § 306; 122 Stat. 1572, 1620-21 (2008).

Veracity argues that if a three-year statute of limitations applies to Plaintiffs' FLSA claims, then it would be entitled to rely on the safe-harbor provision of the TCA as a defense to liability for misclassifications between January 8, 2006, (three years prior to the initiation of this action) and August 9, 2006.  The rationale for the safe-harbor provision is that the scope of the motor carrier exemption changed to exclude "covered employees" who operate vehicles weighing 10,000 pounds or less.  To invoke the safe-harbor provision, the misclassification must be a result of that change in scope.  Conversely, if the misclassification occurred as a result of the motor carrier exemption being inapplicable for a reason unrelated to the weight of the

vehicle, the safe-harbor provision is of no avail.

For the MCA exemption to apply, the employee must work for an employer subject to the jurisdiction of the Secretary of Transportation, and the employee must be "engage[d] in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA]." 29 C.F.R. § 782.2(a). "The carriers whose transportation activities are subject to the Secretary of Transportation's jurisdiction are specified in the Motor Carrier Act itself." Id. § 782.2(b)(1). The jurisdiction of the Secretary of Transportation to establish qualifications and maximum hours of service extends to "motor carriers" and "motor private carriers." 49 U.S.C. § 31502(b).[7]

The term "motor private carrier" means a person, other than a motor carrier, "transporting property by motor vehicle" in interstate or foreign commerce when the person is the owner, lessee, or bailee of the property being transported and "the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." Id. § 31502(15). Notwithstanding the apparent conclusion reached in the 2001 and 2004 DOL audits, the Court concludes that Veracity does not qualify as a "motor private carrier."

The DOL audits found that the investigators qualify for the exemption because they carry property with them when they travel to investigations across state lines. However, for an employer to qualify as a private motor carrier, the employer must also be the owner, lessee, or

---

[7] A "motor carrier" means "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). Veracity conducts investigations; it does not provide motor vehicle transportation for compensation, and, thus, Veracity clearly does not qualify as a "motor carrier."

bailee of the property being transported by the employee.  Although it appears that Veracity is the owner of the video cameras used by its investigators, the investigators were responsible for furnishing their own laptop computers equipped with certain hardware and software and their own cell phones.  See Zamzow Aff., May 13, 2010 [Docket No. 194], Ex. D (Romero Dep.) 134:1-137:22; Ex. F (Szkutnicki Dep.) 42:13-16.  Thus, Veracity was not the owner of much of the property being carried by the investigators as they travelled.

Other courts have emphasized the quantity of the property being transported, as well as its relationship to the reason for the travel, in denying application of the motor carrier exemption. In Rogers v. Savings First Mortgage, LLC, the defendant, a residential mortgage company, argued that its loan officer employees, the plaintiffs, qualified for the motor carrier exemption. 362 F. Supp. 2d 624, 627, 633 (D. Md. 2005).  The defendant argued that because the loan officers regularly drove their personal vehicles across state lines to meet with potential borrowers and brought with them a "loan package consist[ing] of approximately twenty documents," the loan officers "engaged in the transportation of property" and therefore, the defendant was a "motor private carrier."  Id. at 634.  In rejecting the argument, the court concluded:

> It is possible that under some hyper-technical interpretation of the word "property" one could argue that . . . carrying a [one-half] inch file of paper or a few computer disks could be deemed the "transportation of property."  Accepting that interpretation, however, would broaden the interstate transportation exemption to include any individuals whose business requires them to routinely drive across state lines, as almost every such employee would invariably be carrying some "property" of his or her employer, be it an invoice, an order form, a business card, a cell phone or a pager.  If Congress's intent was to exclude so broad a class of individuals from the FLSA (which it certainly could have done) there is no reasonable basis for it to have drafted the exemption in terms of the "transportation of

26

property."

> The general rule of statutory construction is that there is no occasion for construction where the language is clear and unambiguous and does not lead to absurd or impracticable results. There are limits to literalism, however. As the Supreme Court long ago instructed, "[a]ll laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter."

Id. at 636-37 (citation and quotation omitted) (second alteration in original). The court clarified:

> The absurd aspect of Defendants' interpretation of the statute is not that Congress could have intended the exemption to apply to all employees who use their private vehicles to travel over state lines. Congress could have determined that . . . the [Secretary of Transportation] regulate that group of employees. The absurdity is that Congress would have resorted to language related to the transportation of property as the means to define a group that inclusive.

Id. at 637.

The reasoning in Rogers is equally applicable in this case. Veracity is in the business of producing investigations for its clients. Plaintiffs' duty to conduct investigations is the reason for the driving. The transportation of minimal property owned by Veracity, a video camera, when an investigator is driving to an investigation is not a distinct and definite reason for Plaintiffs' travel. The conclusion that Plaintiffs do not qualify for the motor carrier exemption because Veracity is not a motor private carrier is reinforced by the difference between the instant case and Friedrich v. U.S. Computer Services, 974 F.2d 409, 410 (3d Cir. 1992), and Turk v. Buffets, Inc., 940 F. Supp. 1255, 1261 (N.D. Ill. 1996), both of which were cited with approval in Morgan v. Francois, 170 F. App'x 978, 980-81 (8th Cir. 2006) (per curiam). In

those cases, the employees transported replacement parts and other equipment when traveling to a customer's place of business to install, maintain, and repair computer hardware and software. Property was actually "transported" in the sense that it was *delivered* to a customer across state lines. See Dep't of Labor, Opinion Letter No. FLSA2004-10NA at 1(Aug. 17, 2004), available at http://www.dol.gov/whd/opinion/flsa.htm (follow "2004" hyperlink; then follow FLSA2004-10NA "PDF" hyperlink) (opining that the motor carrier exemption had been met based on representations that when the property is transported in interstate commerce, "it is the . . . *fixed and persistent intent* that the products will be *delivered* to the specifically designated retail establishments . . . and as such, the transportation of the property . . . constitutes a practical continuity of movement of the property across state lines from the point of origin to the point of *destination*") (emphases added). Here, however, the cameras and computers are not delivered to a destination across state lines; rather, they remain with the investigator. In addition, the employees in Turk, Friedrich, and Morgan transported the property in employer-owned vehicles. Here, any items transported by the investigators are in a vehicle owned by the investigator, not Veracity. To deem an employer to be a "motor private carrier" is an absurd result when it does not appear from the record that the employer owns any motor vehicles used by investigators.

For these reasons, the record lacks evidence that would support application of the motor carrier exemption. Accordingly, summary judgment is appropriate on the applicability of the motor carrier exemption. Because the change in the scope of the motor carrier exemption resulting from the passage of SAFETEA-LU did not affect whether Plaintiffs qualified for the motor carrier exemption, the safe-harbor provision of the TCA is inapplicable.

**2.      Travel Time**

Veracity moves for summary judgment on Plaintiffs' travel time claims. Veracity argues time traveling between Plaintiffs' homes and surveillance sites amounts to ordinary home-to-work commute time, which is noncompensable under the Portal-to-Portal Act, 29 U.S.C. §§ 251-262. In addition, Veracity argues that Plaintiffs' occasional overnight travel is noncompensable because it occurred outside their normal working hours.

### a. Same-day Travel

The Portal-to-Portal Act provides that employers are not liable under the FLSA for failing to pay an employee overtime compensation for "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" or "activities which are preliminary to or postliminary to said principal activity or activities." 29 U.S.C. § 254(a)(1). Thus, "[a]n employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment" and is not compensable. 29 C.F.R. § 785.35. Acknowledging the effect of these provisions, Plaintiffs clarify that their claim for the time spent traveling to and from surveillance sites is not based on an assertion that they are entitled to compensation for travel time but rather that they performed work activities before leaving for a surveillance site and upon returning to their home that amounted to "principal activities." Engaging in principal activities triggers the continuous workday rule and requires that all periods of time between the commencement of the first principal activity and the completion of the last principal activity be included in the computation of hours worked. The issue pivots on whether the activities Plaintiffs performed before leaving from and upon returning to their homes constitute "principal activities."

Plaintiffs claim they performed several activities before leaving home: (1) completing a preliminary investigation, which included searching for the subject of the investigation on "Facebook, MySpace, Accurint, and other public data [web]sites"; (2) finding directions to the subject's residence; (3) reviewing the investigation assignment sheet; and (4) preparing their vehicles for surveillance by cleaning the interior, filling the gas tank, and cleaning the windows. Pls.' Mem. in Opp'n to Mot. for Partial Summ. J. at 22. Plaintiffs engaged in additional activities when they returned home after an investigation: (1) completing DIRs, which may include watching any video recorded during the investigation and describing it in the DIR; (2) uploading the DIR to Veracity's website; (3) driving to a Federal Express ("FedEx") drop box to mail the video to Veracity; and (4) driving (occasionally) to the subject's house to perform an "activity check." Id. at 23. Plaintiffs argue these activities qualify as "principal activities" because Veracity requires them, views them as important, and trains its investigators on how to accomplish these tasks.

DOL interpretations advise, based on the legislative history, that Congress "intended the words 'principal activities' to . . . include any work of consequence performed for an employer." 29 C.F.R. § 790.8(a); Rutti v. Lojack Corp., Inc., 596 F.3d 1046, 1055 (9th Cir. 2010). In addition, the term "principal activities" in the Portal-to-Portal "embraces all activities which are an integral and indispensable part of the principal activities." Steiner v. Mitchell, 250 U.S. 247, 252-53 (1956) (quotation omitted). Relevant considerations are "whether the activities are performed as part of the regular work of the employees in the ordinary course of business" and "the extent to which the work impacts the employee's freedom to engage in other activities." Rutti, 596 F.3d at 1056 (quotation omitted).

Cleaning, maintenance, and fueling of Plaintiffs' vehicles before leaving for an investigation do not constitute principal activities or activities integral to principal activities that started the work day. In a case involving the performance of similar activities—digging a vehicle out of the mud and snow, changing tires, and putting chains on the tires—the Tenth Circuit held that such activities were "merely incidental to the plaintiffs' travel to and from the [job] sites, and therefore fall within the portal-to-portal exclusion." Smith v. Aztec Well Servicing Co., 462 F.3d 1274, 1291 (10th Cir. 2006). The mapping of directions to the residence of the subject of the investigation also is not a principal activity or an activity integral to principal activities. See Rutti, 596 F.3d at 1057.

However, conducting a preliminary investigation, reviewing an assignment sheet, completing and uploading DIRs, and driving to a FedEx drop box may qualify as either principal activities or activities integral to principal activities. Such activity is similar to the circumstances in Rutti, where the employee was required to electronically transmit recorded information about the installations the employee performed each day. Id. at 1058. Because the activity appeared to be "part of the regular work of the employees in the ordinary course of business," "necessary to the business," and "performed by the employees, primarily for the benefit fo the employer, in the ordinary course of that business," the court found a fact issue persisted on whether the activity was a principal activity or integral to a principal activity. Id.

Although Plaintiffs performed activities prior to leaving for an investigation and upon their return at the end of the investigation, the Court concludes that the performance of those activities does not extend the work day to include the travel time. DOL interpretations provide:

> Periods during which an employee is completely relieved from duty
> and which are long enough to enable him to use the time effectively

31

> for his own purposes are not hours worked. He is not completely
> relieved from duty and cannot use the time effectively for his own
> purposes unless he is definitely told in advance that he may leave the
> job and that he will not have to commence work until a definitely
> specified hour has arrived. Whether the time is long enough to enable
> him to use the time effectively for his own purposes depends upon all
> of the facts and circumstances of the case.

29 C.F.R. § 785.16(a). In <u>Rutti</u>, the court concluded that because the employer allowed the

employee to perform the electronic transmission "at any time between 7:00 p.m. and 7:00 a.m.,"

the employee was, from the moment he completed his last installation of the day, "completely

relieved from duty." 596 F.3d at 1060. Accordingly, the employee had "hours, not minutes, in

which to complete this task," and the intervening time was "'long enough to enable him to use

the time effectively for his own purpose.'" <u>Id.</u> at 1060-61 (quoting <u>Mireles v. Frio Foods, Inc.</u>,

899 F.2d 1407, 1413 (5th Cir. 1990)).

  As in <u>Rutti</u>, the undisputed evidence is that Plaintiffs were not required to perform the

activities claimed to be principal activities or integral to principal activities immediately prior to

leaving for an investigation or immediately after returning home from an investigation. The

assignment sheet is generally emailed to investigators at least a day before the investigation, and,

thus, investigators have ample time to complete the brief task of reviewing the assignment sheet.

Doyle Aff., June 10, 2010 [Docket No. 226] ¶ 2. Likewise, Plaintiffs were not required to

perform preliminary investigations immediately prior to leaving for an investigation, and

investigators often performed preliminary investigations the night before or while they were at

the surveillance site. <u>Id.</u> ¶ 4. Veracity also did not require Plaintiffs to complete DIRs and

upload them to the Veracity website immediately upon returning home after an investigation;

instead, Plaintiffs were free to complete DIRs while at the site conducting a surveillance, and if

they waited until they got home, they had until the following morning to complete and submit DIRs.  Id. ¶ 9.  Finally, the record shows that depositing video recordings at a FedEx drop box was not necessarily a daily task, investigators had the option of having FedEx pick up the videos from their homes, and, in any event, investigators were not required to stop by the drop box on their way home or immediately upon returning home.  See id. ¶ 8.

In short, because investigators are not required to perform these activities "at any specific time means that [they] may use the intervening time for [their] own purposes, and accordingly pursuant to 29 C.F.R. § 785.16, [Veracity] need not compensate [them] for the intervening [travel] time."  Rutti, 596 F.3d at 1061.  Summary judgment in favor of Veracity on Plaintiffs' claims for same-day travel time is granted.

### b.     Overnight Travel

DOL interpretations distinguish overnight travel from same-day travel:

> Travel that keeps an employee away from home overnight is travel away from home.  Travel away from home is clearly worktime when it cuts across the employee's workday.  The employee is simply substituting travel for other duties. . . .  Thus, if an employee regularly works from 9 a.m. to 5 p.m. from Monday through Friday the travel time during these hours is worktime on Saturday and Sunday as well as on the other days. . . .  As an enforcement policy the [DOL] will not consider as worktime the time spent in travel away from home outside of regular working hours as a passenger on an airplane, train, boat, bus, or automobile.

29 C.F.R. § 785.39.  Veracity contends that investigators' normal working hours, though they varied from investigation to investigation, are morning to afternoon.  Any travel away from the investigators' home communities, Veracity explains, occurred either the night before the investigation or in the early morning on the day of the investigation.  Thus, the travel occurred outside the investigators' normal working hours and is therefore noncompensable.

In response, Plaintiffs argue that "[f]or the same reasons that Plaintiffs' [same-day] travel time to and from investigation sites is compensable, their rare overnight travel is compensable as well." Pls.' Mem. in Opp'n to Mot. for Partial Summ. J. at 29. However, as explained in the preceding section, the activities Plaintiffs claim they performed prior to leaving for and upon their return from an investigation do not extend the workday or the normal working hours to include the time spent traveling to and from surveillance sites. Therefore, summary judgment for Veracity on Plaintiffs' claims for overnight travel also is appropriate.

### 3. Fluctuating Workweek Method

Veracity next seeks a summary judgment ruling that the fluctuating workweek ("FWW") method of calculating damages applies if liability is established. Under the FWW method, "a successful plaintiff receives overtime compensation at only half his or her regular rate (instead of the usual one-and-a-half times his or her regular rate)." Ackerman v. Coca-Cola Enters., Inc., 179 F.3d 1260, 1262-63 (10th Cir. 1999) (citing 29 C.F.R. § 778.114). The FWW method applies if: (1) the employee's hours fluctuate from week to week; (2) the employee receives a fixed weekly salary that remains the same regardless of the number of hours worked during the week; (3) the fixed salary provides compensation at a regular rate that is not lower than minimum wage; (4) there is a clear, mutual understanding between the employer and the employee that the employer will pay a fixed weekly salary regardless of the number of hours worked; and (5) the employee receives a fifty percent overtime premium in addition to his fixed weekly salary for all hours worked in excess of forty. Flood v. New Hanover County, 125 F.3d 249, 252 (4th Cir. 1997) (citing § 778.114).

"The propriety of relying on section 778.114(a) and the FWW in cases where the

34

[employee has been] miscategorized by her employer as exempt from the FLSA's overtime provision has divided the federal courts." Urnikis-Negro v. Am. Fam. Prop. Servs., ___ F.3d ___, 2010 WL 3024880, at *1 (7th Cir. Aug. 4, 2010). Compare Russell v. Wells Fargo & Co., 672 F. Supp. 2d 1008, 1013-14 (N.D. Cal. 2009) (holding that the FWW cannot be used retrospectively in a misclassification case) with Desmond v. PNGI Charles Town Gaming, LLC, 661 F. Supp. 2d 573, 579-85 (N.D. W. Va. 2009) (applying the FWW method in a case where the employer misclassified its employees as exempt). The Seventh Circuit recently faced the issue in Urnikis-Negro. 2010 WL 3024880, at *7-18. The court agreed with cases such as Russell that the requirements of § 778.114(a) are not satisfied in a misclassification case. Id. at *14. However, the court disagreed with the ultimate holding in those cases that the FWW method has no applicability in a misclassification case, ruling instead that the conclusion that § 778.114(a) "itself is inapplicable does not compel the conclusion that reliance on the FWW method of calculating [an employee's] regular rate [is] erroneous." Id. at *14. In that regard, the Seventh Circuit's decision agrees with the Desmond line of cases.

The Seventh Circuit's decision methodically analyzes the competing arguments that have lead to the split in authority on the applicability of the FWW method to a misclassification case. The Court adopts the reasoning thoroughly set forth in Urnikis-Negro.

Regardless of § 778.114(a), "a court still must ascertain the employee's regular rate of pay and calculate an appropriate overtime premium based on that rate." Id. When an employee is "paid a fixed weekly salary, this requires first determining the number of hours that salary was intended to compensate." Id. While it might be presumed that "a misclassified employee's fixed weekly salary was meant to compensate him solely for 40 hours, the presumption cannot be

irrebutable." Id. To the contrary, "[t]he employee's regular rate of pay is a factual matter, and where the employer and the employee have in fact agreed that a fixed weekly salary will constitute payment at the regular rate for any and all hours worked," which the Supreme Court's decision in Overnight Motor Transportation Co. v. Missel[8] permits, "there is no factual basis for deeming the salary to constitute straight-time compensation for 40 hours alone." Id. (citation omitted).

In Urnikis-Negro, the evidence "was mixed as to the number of hours [the plaintiff's] fixed weekly salary was meant to compensate." Id. at *15. Acting as the factfinder, the district court found that "although [the plaintiff] likely thought she would be working 40-hour weeks, 'her understanding was that her salary was to cover whatever time she was called upon to work in a given week.'" Id. Thus, the district court determined that the plaintiff and the defendant "had a 'clear mutual understanding' that her weekly salary of $1,000 was meant to compensate her for however many hours she worked, not 40 or some other number." Id. On appeal, the Seventh Circuit concluded that the district court's finding was not clearly erroneous, and, therefore, application of the FWW method was appropriate. Id. The court explained:

> Given this finding, it is Missel which dictates how the regular rate of pay must be calculated here. Urnikis-Negro, like Missel, was paid a fixed weekly sum for any and all hours that she worked. Like Missel, she routinely worked substantial amounts of overtime. And like Missel, she never received any premium for the overtime hours she worked. The Supreme Court held that in this situation, the employee's regular rate of pay for a given week is calculated by dividing the fixed weekly wage by the total number of hours worked in that week. The employee is then entitled to an overtime premium of one-half of that rate.

---

[8] 316 U.S. 572, 580 (1942), superseded on other grounds by statute as stated in Trans World Air Lines, Inc. v. Thurston, 469 U.S. 111, 128 n.22 (1985).

Id. (citations omitted).

Here, as in Urnikis-Negro and Missel, Plaintiffs were paid a fixed weekly sum for any and all hours that they worked.  Plaintiffs allege they routinely worked substantial amounts of overtime and never received any premium for the overtime hours they worked.  See, e.g., Ahle Dep. 77:23-78:17, 82:10-83:8; Szkutnicki Dep. 42:21-44:15; Zamzow Aff., May 13, 2010, Ex. G (Cruz Dep.) 10:21-24, 13:24-14:12, 74:2-76:5.  Plaintiffs do not dispute this evidence and instead argue that the reasoning in cases such as Russell, which ultimately held that the FWW method cannot apply retrospectively in a misclassification case, is correct.  The Court will follow the approach described in Urnikis-Negro , which relies on principles set forth in Missel.  The FWW method shall apply to any damages Plaintiffs establish for unpaid overtime.

### 4.      Liquidated Damages

Both Veracity and Plaintiffs move for summary judgment on the issue of liquidated damages.  "An award of liquidated damages is mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA."  Jarrett v. ERC Props., Inc., 211 F.3d 1078, 1083 (8th Cir. 2000).  The "good faith" requirement is a subjective standard and requires the employer to show "'an honest intention to ascertain and follow the dictates of the FLSA.'"  Chao v. Barbeque Ventures, LLC, 547 F.3d 938, 942 (8th Cir. 2008) (quoting Hultgren v. County of Lancaster, 913 F.2d 498, 509 (8th Cir. 1990)).  An employer must show that it "took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions."  Id. (quotation omitted).  "The reasonableness requirement imposes an objective standard by which to judge the employer's conduct.  Ignorance alone will not exonerate the employer."  Id. (quotations omitted).  Liquidated damages is "the norm" and

the employer's burden "is a difficult one."  Id. at 941-42.

Veracity argues that its actions evince both subjective good faith and reasonable grounds for believing it was not violating the FLSA.  Specifically, Veracity emphasizes that the 2001 and 2004 DOL audits both resulted in the conclusion that Veracity had not misclassified its employees as exempt.  In addition, a 2006 wage and hour complaint filed with the Texas Workforce Commision resulted in a conclusion that "[t]he evidence is not sufficient to support a finding that a sum of money is due to the claimant for unpaid overtime."  Foster Decl., May 13, 2010 [Docket No. 195], Ex. E.  Furthermore, Veracity claims that it has repeatedly sought legal advice on its employment practices and that it has never been advised to reclassify its investigators as nonexempt.

In Hultgren, the Eighth Circuit determined that evidence that an employer obtained an evaluation from the DOL and consulted with counsel multiple times is sufficient to demonstrate an honest intention to follow the dictates of the FLSA.  913 F.2d at 509.  Here, too, the evidence shows that Veracity's decision to continue classifying investigators as exempt was based on the conclusion reached by the DOL in the 2001 and 2004 audits and the advice of counsel.

Plaintiffs maintain, however, that Veracity's reliance on the DOL audits and the advice of counsel is deficient on the issue of subjective good faith because rather than seek out the advice of counsel and guidance of the DOL, the advice and guidance were thrust upon Veracity as a "necessary consequence of having been audited by the DOL."  Pls.' Mem. in Opp'n to Mot. for Partial Summ. J. [Docket No. 207] at 11.  In taking this position, Plaintiffs rely on two cases from the Middle District of Florida arising from similar circumstances.  In Silas v. Hillsborough County, No. 8:04CV1616, 2006 WL 3133026, at *6 (M.D. Fla. Oct. 30, 2006), and McGuire v.

Hillsborough County, 511 F. Supp. 2d 1211, 1216 (M.D. Fla. 2007), the court concluded that because a letter sent by the defendant to the DOL was dated within the last six months of the violations alleged in the complaint and the letter stated that it was a response to issues raised by the DOL, not the defendant, it could not conclude on the basis of the letter that the defendant had an honest intention to ascertain what the FLSA requires.  Id.  Nothing in these cases indicates whether the DOL provided the defendant-employer with any guidance or conclusions regarding the propriety of its employment practices.  Here, by contrast, the DOL provided Veracity with the conclusion that the investigators were correctly classified under the motor carrier exemption.  Although that conclusion was incorrect, see infra III.B.3, Veracity's reliance on it is understandable.

Plaintiffs contend that since the 2004 DOL audit was concluded, Veracity has "resumed its practice of ignorance" and has done nothing to ensure its classification of employees complies with the FLSA.  Pls.' Mem. in Opp'n to Mot. for Partial Summ. J. at 14.  Plaintiffs insist that Veracity "cannot reasonably expect to rely on the results of a DOL audit that took place six years ago."  Pls.' Mem. in Supp. of Summ. J. at 39.  However, Veracity proffers evidence that after the 2004 DOL audit, it has continued to take action, employing attorneys for the purpose of "assessing every aspect, from policy manuals to handbooks to any type of employee dispute." Doyle Dep. 25:12-24; Foster Dep. 37:21-39:18.

While Veracity did not specifically instruct its attorneys to evaluate the propriety of its FLSA classification of investigators, Veracity's continued legal counsel on all aspects of its business and employment practices raises a fact issue on the subjective good faith and objective reasonableness of its classification decision in the years following the 2004 DOL audit.  "What

constitutes good faith on the part of an employer and whether the employer had reasonable grounds for believing that its act or omission was not a violation of the FLSA are mixed questions of fact and law." Gallegos v. Equity Title Co. of Am., Inc., 484 F. Supp. 2d 589, 599 (W.D. Tex. 2007) (citing Dybach v. Fla. Dep't of Corr., 942 F.2d 1562, 1566 (11th Cir.1991)). Here, there are questions of fact that preclude the Court from ruling on the issue of liquidated damages as a matter of law.

### 5. Statute of Limitations

The two-year statute of limitations set forth in 29 U.S.C. § 255 for FLSA claims may be extended to three years if the employee can show the employer's violation was willful, meaning that the employer "knew or showed reckless disregard" for whether its conduct violated the FLSA. Smith v. Heartland Auto. Servs., Inc., 418 F. Supp. 2d 1129, 1141 (D. Minn. 2006) (quotation omitted). This willfulness standard employed in determining the statute of limitations is distinct from the good faith standard applicable to the issue of liquidated damages. See Brown v. Fred's, Inc., 494 F.3d 736, 743 (8th Cir. 2007). A finding that an employer failed to prove good faith does not necessarily require a finding that the employer acted willfully; nor does a finding that the employee failed to prove a willful violation require a finding that the employer acted in good faith. See Rodriquez v. Farm Stores Grocery, Inc., 518 F.3d 1259, 1274 (11th Cir. 2008); cf. Broadus v. O.K. Indus., Inc., 226 F.3d 937, 944 (8th Cir. 2000) (holding in an employment discrimination case under the Equal Pay Act that "[t]he jury's decision on willfulness is distinct from the district judge's decision to award liquidated damages"). On the other hand, courts have recognized the logic that a finding of employer good faith is inconsistent with and would preclude a finding of willfulness. See Chao v. A-One Med. Servs., Inc., 346

F.3d 908, 920 (9th Cir. 2003). Although the Eighth Circuit has declined to "go so far as to rule out the possibility of good faith and willfulness in an unusual case," it has held that "a district court's finding of employer good faith in the face of a jury's presumptively contrary finding of willfulness requires close scrutiny on appeal," Jarrett, 211 F.3d at 1084.

Just as fact issues preclude a decision at law on liquidated damages, unresolved fact issues remain on Plaintiffs' claim that any violation was willful. Therefore, resolution of the issue of whether the three-year statute of limitations applies is premature.

In sum, Plaintiffs' partial summary judgment motion is granted with respect to the administrative, outside sales, and motor carrier exemptions and denied as to the issue of liquidated damages, and Veracity's motion is granted as to the travel time claims and the applicability of the FWW method and denied with respect to liquidated damages and the length of the statute of limitations.

**B.      Decertification**

Section 216(b) of the FLSA allows one or more employees to bring a collective action to collect unpaid overtime compensation against an employer "for and in behalf of himself or themselves and other employees similarly situated." For a case to proceed as a collective action under § 216(b), the plaintiffs must show that they are "similarly situated." See Smith, 404 F. Supp. 2d at 1149. This burden is "not so rigorous that [the plaintiffs] must demonstrate their positions are identical," but merely that their positions are "similar." Nerland v. Caribou Coffee Co., Inc., 564 F. Supp. 2d 1010, 1018 (D. Minn. 2007) (quotation omitted). Although the FLSA does not define the term "similarly situated," and the Eighth Circuit has not yet considered the term's meaning, the "well-established" procedure in this district is to approach the issue of

determining "similarly situated" through a two-stage process.  Luiken v. Domino's Pizza LLC, Civil No. 09-516, 2009 WL 4723296, at *4 n.2 (D. Minn. Dec. 2, 2009) (collecting cases).  The Court's September 23, 2009 Order [Docket No. 98] granting conditional class certification represented the first stage of that process.  Discovery is complete, and this case is now at the second stage.

In the second stage, a court must make a factual determination on whether the plaintiffs are similarly situated.  Nerland, 564 F. Supp. 2d at 1017.  If the claimants are found to be similarly situated, the court allows the case to proceed to trial as a collective action; but if not, the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice, and the named plaintiffs proceed to trial on their individual FLSA claims.  See id. at 1017-18.  In deciding whether the plaintiffs are similarly situated, a court considers several factors, including (1) the extent and consequences of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) other fairness and procedural considerations.  Id. at 1018; Smith, 404 F. Supp. 2d at 1150 (quoting Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001)).

## 1.    Disparate Factual and Employment Settings

Veracity argues that Plaintiffs have "widely varying factual and employment settings," which makes them dissimilar and warrants decertification.  Def.'s Mem. in Supp. of Mot. to Decertify [Docket No. 233] at 35.  According to Veracity, investigators perform, in addition to investigations, a host of other duties such as claims work, sales, marketing, delegating work, client account management, supervision, training, management, quality control, recruiting,

hiring, and recommending discipline of other employees. The relevance of these other duties is their impact on the applicability of certain exemptions from the FLSA's overtime requirements. See id. at 39. As discussed in the analysis of the parties' cross-motions for summary judgment, see supra III.A.1.a-b, the evidence of investigators having performed duties other than investigations is insufficient to demonstrate a genuine issue of material fact as to whether those other duties constitute investigators' primary duty which would trigger application of the exemptions.

Plaintiffs have submitted evidence that they share similar factual and employment settings. They all had the same primary job duty, conducting investigations, when employed by Veracity. Morgan Decl., May 13, 2010, Exs. 13, 14 ¶ 10. They all were assigned to Veracity's investigative division and they all were required to follow the same procedures and protocol in conducting their investigations, including performing preliminary investigations, conducting surveillance, taking witness statements, and completing and submitting DIRs. See, e.g., id. ¶¶ 6-8, 10, 11. Plaintiffs also are similarly situated in the sense that Veracity's decision to classify them as exempt was not the result of a fact-intensive analysis of the specific duties performed by each individual investigator or of the specific duties performed by investigators at the various titles and levels. Rather, it was the result of a single decision by Veracity's founders that exemption was an industry standard, and that decision was applied uniformly to all levels of investigators regardless of their actual duties. The uniformity of treatment strongly suggests that Plaintiffs are indeed similarly situated. See Nerland, 564 F. Supp. 2d at 1024 (observing that an employer's argument that employees could not proceed collectively to challenge the classification as exempt was "disingenuous" given that the employer's classification decision

was done collectively and generally).[9]

## 2. Individualized Defenses

The second factor in deciding whether the named plaintiffs and opt-in plaintiffs are similarly situated requires the Court to consider whether potential defenses would make the proposed collective action unmanageable. Nerland, 564 F. Supp. 2d at 1024. Veracity argues for decertification because it alleges two types of defenses can be resolved only on an individual basis: (1) the applicability of various exemptions and (2) Veracity's "right to address the credibility, fraud, and diverse testimony regarding the actual hours worked by Plaintiffs in order to present its defense as to the overtime component of liability." Def.'s Mem. in Supp. of Mot. to Decertify at 41.

### a. Exemptions

Veracity argues that "misclassification cases are unsuited for collective action treatment." Def.'s Mem. in Supp. of Mot. to Decertify [Docket No. 233] at 30. Veracity contends the Court must individually evaluate "whether a particular exemption applies to an employee." Id. at 31. This will require, Veracity maintains, an analysis of each individual investigator's daily job

---

[9] Veracity emphasizes that this observation in Nerland was based on the decision in Wang v. Chinese Daily News, Inc., 231 F.R.D. 602, 613 (C.D. Cal. 2005), which has since been undermined (if not implicitly overruled) by In re Wells Fargo Home Mortgage Overtime Pay Litigation, 571 F.3d 953, 958-59 (9th Cir. 2009) and Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 946 (9th Cir. 2009). Those cases questioned Wang to the extent that it seemed to establish a per se rule that class certification is warranted "whenever an employer uniformly classifies a group of employees as exempt" and without any consideration of the employees' actual work activities. Vinole, 571 F.3d at 945. Vinole and Wells Fargo did not, however, hold that the fact that an employer uniformly classified a group of employees as exempt was irrelevant. To the contrary, "uniform corporate policies will often bear heavily on questions of predominance and superiority," and "[s]uch centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible of common proof." Wells Fargo, 571 F.3d at 958-59.

duties. However, if such an argument were credited, "no FLSA action could be resolved through the collective action process, thereby defeating the stated purpose of the FLSA and wasting judicial resources by requiring courts to consider each individual plaintiff's claims in a separate lawsuit." Indergit v. Rite Aid Corp., Nos. 08 CIV. 9361, 08 CIV. 11364, 2010 WL 2465488, at *9 (S.D.N.Y. June 16, 2010) (citing Nerland, 564 F. Supp. 2d at 1025-26). Instead "many courts have expressly rejected" the "sweeping proposition that any case that turns on the application of the FLSA's . . . exemption[s] cannot be resolved through a collective action." Id. (collecting cases). In addition, the summary judgment ruling that Veracity has failed to establish a genuine issue of material fact on the applicability of the administrative, outside sales, and motor carrier exemptions, see supra III.A.1, eliminates individual issues regarding the applicability of those exemptions.

Veracity cites two other exemptions not addressed in the summary judgment briefing that it claims are still at issue in this lawsuit: the executive exemption and the combined exemption. Plaintiffs argue that Veracity should be estopped from relying on these exemptions because Veracity never notified them before the close of discovery of its intention to assert these exemptions and, therefore, allowing the exemptions to be asserted now would "greatly prejudice Plaintiffs." Pls.' Mem. in Opp'n to Mot. to Decertify [Docket No. 264] at 36-37. Veracity responds that because it pleaded the affirmative defense that "Plaintiffs and members of the alleged Class are exempt from the overtime provisions of the FLSA and are therefore not entitled to overtime compensation," see Answer, Defenses ¶ 4, it has not waived any exemption defense and "is entitled to raise all available exemptions as defenses, without specifically naming each." Def.'s Rep. Mem. in Supp. of Mot. to Decertify [Docket No. 275] at 1-2. In support of its

position, Veracity cites <u>Schmidt v. Eagle Waste & Recycling, Inc.</u>, 599 F.3d 626, 632 (7th Cir. 2010), and <u>Hunter v. Sprint Corp.</u>, 453 F. Supp. 2d 44, 51 n.3 (D.D.C. 2006), both of which rejected the argument that an employer waived the right to assert specific exemption defenses when its answer pleaded only the general assertion that the employees were exempt.

The Court finds Veracity's position untenable. The argument an employer need only plead that its employees are exempt from the FLSA's overtime provisions to preserve all conceivable exemptions is contrary to the pleading standards announced by the Supreme Court in <u>Bell Atlantic Corp. v. Twombly</u> and <u>Ashcroft v. Iqbal</u>, which deem "formulaic" or "[t]hreadbare" recitals of the elements of a claim inadequate under Rule 8 of the Federal Rules of Civil Procedure. <u>Twombly</u>, 550 U.S. 544, 555 (2007) ("formulaic"); <u>Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) ("[t]hreadbare"). To be sure, <u>Twombly</u> and <u>Iqbal</u> are directed toward the pleading standards of a claim, and the Supreme Court did not expressly rule that those standards also apply to issues on which the defendant will bear the burden of proof, including affirmative defenses. Although no circuit court has yet to rule on the issue of whether the standards of <u>Twombly</u> and <u>Iqbal</u> also apply to the pleading of affirmative defenses, a "majority of district courts that have addressed this question have answered in the affirmative." <u>Bradshaw v. Hilco Receivables, LLC</u>, ___ F. Supp. 2d ___, 2010 WL 2948181, at *3 (D. Md. July 27, 2010); <u>see also</u> <u>Francisco v. Verizon South, Inc.</u>, Civil Action No. 3:09cv737, 2010 WL 2990159, at *6, nn.3-4 (E.D. Va. July 29, 2010) (identifying eighteen district court decisions extending the standards to affirmative defenses and seven decisions that have declined to do so). The arguments in favor of extending <u>Twombly</u> and <u>Iqbal</u> to affirmative defenses are compelling:

> [T]the purpose of pleading sufficient facts in an affirmative defense
> is to give fair notice to the opposing party that there is some

> plausible, factual basis for the assertion and not simply to suggest some possibility that it might apply to the case. Thus, in addition to increasing litigation costs, [b]oilerplate defenses clutter [the] docket; they create unnecessary work, and in an abundance of caution require significant unnecessary discovery. Consequently, when such defenses are alleged, the Court must address what are often unnecessary motions for summary judgment and extend pretrial conferences in order to narrow the issues. Therefore, the Court needs some statement of the underlying facts in order to focus the scope of discovery, particularly when a defendant alleges more than nineteen defenses, due to the growing tendency to assert such boilerplate defenses.

Castillo v. Roche Labs., Inc., No. 10-20876-CIV, 2010 WL 3027726, at *3 (S.D. Fla. Aug. 2, 2010) (quotations and citations omitted) (second and third alterations in original).

The assertion in Veracity's Answer that Plaintiffs "are exempt from the overtime provisions of the FLSA"—one of 26 affirmative defenses that Veracity pleaded in its Answer—is merely a label, conclusion, or formulaic recitation of an affirmative defense. For that reason, the executive and combined exemptions can arguably be disregarded if the Twombly and Iqbal standards apply to the pleading of affirmative defenses.

Even if the heightened pleading standards are not applicable to affirmative defenses, Plaintiffs have not been given adequate notice that the executive and combined exemptions are claimed to be relevant to the investigators remaining in this collective action.[10] Plaintiffs would be greatly prejudiced if Veracity were allowed to assert those defenses now, after discovery has closed and the deadline for nondispositive and dispositive motions has passed. See First Union

---

[10] Originally, Plaintiffs' proposed a class that included all surveillance investigators (levels 1-3), claims investigators (level 4), senior field investigators (level 5), and senior operations investigators (level 5). See Sept. 23, 2009 Order at 4-6. In granting conditional certification, the Court excluded level 5 senior operations investigators, and it now appears, based on Plaintiffs' representation at oral argument, that only one individual who advanced to level 5 senior field investigator remains.

Nat'l Bank v. Pictet Overseas Trust Corp., Ltd., 477 F.3d 616, 622, n.9 (8th Cir. 2007) (indicating that a defendant should not be permitted to rely on an affirmative defense raised late in the litigation, in a manner that is contrary to principles of notice pleading and results in "unfair surprise" or prejudice).

### b. Credibility Issues

Veracity argues that to prove a violation of the FLSA, Plaintiffs must show they were misclassified, and that they did in fact work the overtime hours they claim they worked. Veracity contends that there is wide variation in the number of overtime hours each individual investigator claims to have worked. Veracity intends to submit evidence certain investigators engaged in fraudulent reporting of their time, which they have not deducted from the hours estimates they have submitted. Veracity insists that it has "the right to address the credibility, fraud, and diverse testimony regarding the actual hours worked by Plaintiffs in order to present its defense as to the overtime component of liability." Def.'s Mem. in Supp. of Mot. to Decertify at 39-42.

Without question, there are issues in this litigation—primarily ones of credibility of Plaintiffs' allegations that each of them did in fact work more than forty hours per week—that are of an individualized nature. However, there are important common issues as well: (1) whether Veracity can carry its burden of proving that good faith and reasonable grounds for believing that it was not in violation of the FLSA, thus eliminating liquidated damages and (2) whether Plaintiffs can carry their burden of proving that Veracity committed a willful violation of the FLSA, thus extending the statute of limitations to three years. These questions focus on Veracity's intent in deciding to uniformly classify its investigators as exempt, an issue that is

highly amenable to resolution on a class-wide basis. In the balance, the individual questions are not so significant as compared with the common issues as to render continued collective treatment unmanageable.

### 3.    Fairness and Other Procedural Considerations

The FLSA is remedial in nature and therefore "'should be given a broad reading, in favor of coverage.'" Nerland, 564 F. Supp. 2d at 1025 (quoting Kelley v. Alamo, 964 F.2d 747, 749-50 (8th Cir. 1992)). Through § 216(b), Congress has stated a policy that plaintiffs claiming wage violations under the FLSA "should have the opportunity to proceed collectively" and that such collective actions allow the plaintiffs "the advantage of lower individual costs to vindicate rights by the pooling of resources." See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989) (discussing § 216(b) in the context of a collective action for violations of the Age Discrimination and Employment Act). The judicial system also benefits through the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [violative] activity." Id. Thus, FLSA collective actions operate to "serve the interests of judicial economy and to aid in the vindication of plaintiffs' rights." Freeman v. Wal-Mart Stores, Inc., 256 F. Supp. 2d 941, 944 (W.D. Ark. 2003).

Here, the balance favors continued collective treatment because many of the individual investigators have claims with relatively small economic value, making it impracticable for them to pursue their claims individually. Such concerns for ensuring that the remedial nature of the FLSA is realized are not, by themselves, an adequate reason for allowing a case to proceed as a collective action, but they do suggest that "a close call as to whether the plaintiffs are similarly situated should be resolved in favor of certification." Crawford v. Lexington-Fayette Urban

<u>County Gov't</u>, No. 06-299-JBC, 2008 WL 2885230, at *11 (E.D. Ky. July 22, 2008) (citing

<u>Falcon v. Starbucks Corp.</u>, 580 F. Supp. 2d 528, 541 (S.D. Tex. 2008)).  In addition, as noted

previously, common issues of law and fact have been raised that are amenable to resolution

through common evidence, and the judicial system will benefit from the efficient resolution of

those issues in one proceeding.  <u>See</u> <u>Hoffmann-La Roche</u>, 493 U.S. at 170.

The factors considered above weigh in favor of allowing the case to proceed as a

collective action.  The Court finds, therefore, that Plaintiffs are similarly situated for purposes of

collectively adjudicating their FLSA claims.[11]

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Plaintiffs' Motion for Partial Summary Judgment [Docket No. 183] is

    **GRANTED** in part and **DENIED** in part;

2.  Veracity's Motion for Partial Summary Judgment [Docket No. 191] is

    **GRANTED** in part and **DENIED** in part; and

---

[11] Plaintiffs argue that the Court should strike sixteen affidavits of third-party witnesses
submitted by Veracity along with its reply memorandum in support of the decertification motion
on the basis that Veracity never disclosed those witnesses to Plaintiffs.  The affidavits were not
relied upon in deciding the cross-motions for summary judgment or the motion to decertify, and,
accordingly, Plaintiffs' request to strike the affidavits is denied as moot.

3.     Veracity's Motion to Decertify [Docket No. 231] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 25, 2010.